STATE OF CONNECTICUT *v.* TERRANCE R.A. JACOB
(AC 21375)

Mihalakos, Flynn and Shea, Js.

Argued November 30, 2001—officially released May 14, 2002

*Terrance R.A. Jacob*, pro se, the appellant (acquittee).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Vicki Melchiorre*, supervisory assistant state's attorney, for the appellee (state).

*Gerard A. Smyth*, chief public defender, *Monte P. Radler*, public defender, and *Suzanne L. McAlpine*, deputy assistant public defender, filed a brief for the office of chief public defender as amicus curiae.

*Opinion*

FLYNN, J. The acquittee,[1] Terrance R.A. Jacob, appeals from the judgment of the trial court dismissing[2]

---

[1] An " '[a]cquittee' [is] any person found not guilty by reason of mental disease or defect pursuant to section 53a-13 . . . ." General Statutes § 17a-580 (1).

[2] The notation by the trial judge on the application states: "Denied." Because General Statutes § 17a-593 (g) (1) provides that the court shall

his application for discharge from the custody and jurisdiction of the psychiatric security review board (board). On appeal, the acquittee claims that (1) General Statutes § 17a-593 violates the due process rights of Connecticut acquittees because it is unconstitutionally vague, (2) the court's finding that the acquittee is currently mentally ill to the extent that his discharge would constitute "a danger to himself or others" was not supported by the evidence presented at the hearing, (3) the court's finding that the acquittee is currently mentally ill to the extent that his discharge would constitute "a danger to himself or others" was in contravention of the United States Supreme Court's holding in *Foucha* v. *Louisiana*, 504 U.S. 71, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992), and (4) the court's denial of the acquittee's application for discharge was improperly based on information that was either misinterpreted by the court or false. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. In 1986, following the stabbing and robbing of a nun who had offered him a ride in her car because she thought he was a stranded motorist, the acquittee was charged with the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), assault in the second degree in violation of General Statutes § 53a-60 (a) (2) and larceny in the first degree in violation of General Statutes § 53a-122 (a) (3). On May 11, 1987, he was found not guilty by reason of mental disease or defect pursuant to General Statutes § 53a-13.[3] On July 13, 1987, following an initial commitment to the custody of the commissioner of

order the dismissal of an unsuccessful application, we treat the court's denial in this case as a dismissal.

[3] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

mental health and addiction services for a psychiatric evaluation pursuant to General Statutes § 17a-582 (a), the court, *W. Sullivan, J.*, committed the acquittee to the jurisdiction of the board for a period not to exceed twenty years.[4]

On September 22, 1999, in accordance with § 17a-593 (a), the acquittee filed an application with the court seeking a discharge from the custody and jurisdiction of the board. The court forwarded the acquittee's application to the board, which held a hearing on the application pursuant to § 17a-593 (d). On April 20, 2000, the board filed a report with the court recommending that the acquittee not be discharged from its jurisdiction because it found that the acquittee "remains mentally ill and continues to require treatment and supervision for that illness and that without such treatment [he] would pose a danger to himself or others." After receipt of that report, the court, *Richards, J.*, promptly held a hearing on the acquittee's application for discharge pursuant to § 17a-593 (f).[5] On the basis of its consideration of the testimony of the five witnesses who appeared at the hearing: Peter Zeman, Kenneth Selig and Patrick Fox, psychiatrists; Stephen Curtain, the acquittee's employer; and the acquittee himself, and all of the other evidence, the court concluded that the acquittee was currently mentally ill to the extent that his discharge would constitute a danger to himself or

---

[4] If the court finds that the acquittee is a person who should be confined, the court shall order the acquittee committed to the jurisdiction of the board and shall fix a maximum term of commitment, which term cannot exceed the maximum sentence that the acquittee would have received had he been convicted of the offenses charged. General Statutes § 17a-582 (e) (1).

[5] The acquittee filed a second application for discharge with the court on May 18, 2000. Although the state's brief seems to indicate that the hearing that was held before the court was conducted on the basis of the acquittee's May 18, 2000 application for discharge, we conclude that the hearing was conducted after receipt of the board's report regarding the acquittee's September 22, 1999 application.

others. The court, therefore, dismissed the acquittee's application for discharge. This appeal followed. Additional facts will be set forth as necessary.

I

The acquittee first claims that § 17a-593 violates the right of Connecticut acquittees to due process of law because it is impermissibly vague. In support of this claim, the acquittee advances two arguments. First, he argues that § 17a-593 is unconstitutionally vague because it requires an acquittee to prove by a preponderance of the evidence that he is no longer mentally ill to the extent that his discharge would pose a danger to himself or others, yet it fails to define "danger" or "dangerous." Second, he argues that the statute is unconstitutionally vague because it requires an acquittee to prove that his discharge will not constitute a danger to himself or others, which necessarily requires making a prediction about future conduct. He claims that no acquittee can meet this burden of proof because it is virtually impossible to predict future conduct. We conclude that § 17a-593 is not unconstitutionally vague.

The acquittee did not raise the vagueness claim in the trial court. A party can prevail on an issue not raised at trial only if all of the four requirements set out in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), have been met. We conclude that the first two prongs of *Golding* have been satisfied in that the record is adequate for review and the acquittee's claim is of constitutional magnitude. The acquittee has failed, however, to satisfy the third prong of *Golding*, which requires that a constitutional violation clearly existed and clearly deprived him of the right to a fair trial.

At the outset we note our standard of review. "In analyzing this claim, we proceed from the well recognized jurisprudential principle that [t]he party attacking

a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality." (Internal quotation marks omitted.) *Thalheim* v. *Greenwich*, 256 Conn. 628, 640, 775 A.2d 947 (2001).

We now turn to the statute at issue, § 17a-593. Under this statute, "[a]n acquittee may apply for discharge [from the jurisdiction of the board] not more than once every six months . . . ." General Statutes § 17a-593 (a). "The court shall forward any application for discharge received from the acquittee . . . to the board. The board shall . . . file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report." General Statutes § 17a-593 (d). "Within ten days of receipt . . . of the board's report filed under subsection (d) of this section, either the state's attorney or counsel for the acquittee may file notice of intent to perform a separate examination of the acquittee. An examination conducted on behalf of the acquittee may be performed by a psychiatrist or psychologist of the acquittee's own choice and shall be performed at the expense of the acquittee unless he is indigent. If the acquittee is indigent, the court shall provide him with the services of a psychiatrist or psychologist to perform the examination at the expense of the state. . . ." General Statutes § 17a-593 (e).

"After receipt of the board's report and any separate examination reports, the court shall promptly commence a hearing on the . . . application for discharge . . . . At the hearing, the acquittee shall have the burden of proving by a preponderance of the evidence that the acquittee is a person who should be discharged."

General Statutes § 17a-593 (f). A " '[p]erson who should be discharged' means an acquittee who does not have psychiatric disabilities . . . to the extent that his discharge would constitute a danger to himself or others . . . ." General Statutes § 17a-580 (11).[6] " 'Danger to himself or others' includes danger to the property of others." General Statutes § 17a-580 (5).

After the hearing, "[t]he court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the . . . application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. . . ." General Statutes § 17a-593 (g).

We now set forth the law pertaining to vagueness claims. "The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution."[7] *State* v. *Burton*, 258 Conn. 153, 158, 778 A.2d 955 (2001). "The essential purpose of the 'void for vagueness' doctrine is to warn individuals of the *criminal* consequences of their *conduct*. . . . [C]riminal statutes which fail to give due notice that an act has been made criminal before it is done are unconstitutional deprivations of due process of law." (Citations

---

[6] We use the phrases mental illness, mental disability and psychiatric disability interchangeably.

[7] The fifth amendment to the United States constitution provides in relevant part: "No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

omitted; emphasis added.) *Jordan* v. *De George*, 341 U.S. 223, 230, 71 S. Ct. 703, 95 L. Ed. 886 (1951).

We note that the statute at issue in the present case, § 17a-593, is not a criminal statute. "[T]he confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not 'punishment' for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness." (Internal quotation marks omitted.) *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 683–84, 578 A.2d 1025 (1990). We also note that § 17a-593 was not intended to guide any individual conduct on the part of the acquittee but, rather, it serves to guide the court in making a determination about whether an acquittee is a "person who should be discharged." In that sense, it is similar to the now repealed proportionality review provisions of the death penalty statute, which also were enacted as a guide to the court and which have been held to survive a vagueness challenge. See *State* v. *Webb*, 238 Conn. 389, 530–32, 680 A.2d 147 (1996) (proportionality review statute does not impermissibly delegate law enforcement to judges for resolution on an ad hoc and subjective basis).

"While a statute may be invalidated as impermissibly vague as a result of a failure to give fair warning of the conduct proscribed by law, generally, the fair-warning requirement is not applicable to commitment scheme challenges, since the person is not confined as a result of any particular acts he or she may have performed, but is instead confined on the basis of his or her status. . . ." 53 Am. Jur. 2d 464, Mentally Impaired Persons § 4 (1996).

We, nonetheless, apply the void for vagueness doctrine to § 17a-593 in recognition of the fact that involun-

tary commitment imposes a significant curtailment on liberty. See, e.g., *Jordan* v. *De George*, supra, 341 U.S. 231 (applying vagueness doctrine in view of grave nature of deportation, despite fact that deportation statute at issue was not criminal statute).

"[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (Internal quotation marks omitted.) *Jones* v. *United States*, 463 U.S. 354, 361, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983), quoting *Addington* v. *Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979).

### A

The acquittee first claims that § 17a-593 is unconstitutionally vague because it requires a Connecticut acquittee to prove by a preponderance of the evidence that his discharge would not pose a "danger to himself or others" but does not define "danger" or "dangerous." The acquittee further claims that because the word "danger" has been defined by § 17a-580 (5) to include danger to property, it has been given a meaning different from that of its ordinary meaning for purposes of a § 17a-593 hearing. We disagree.

The lack of an express definition does not, in and of itself, render a statute void for vagueness. See *Ferreira* v. *Pringle*, 255 Conn. 330, 356, 766 A.2d 400 (2001). "[T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . Reference to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair

warning." (Citation omitted; internal quotation marks omitted.) Id., 355–56.

General Statutes § 1-1 (a) provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

According to Merriam-Webster's Collegiate Dictionary (10th Ed. 1999), "danger" means "exposure or liability to injury, pain, harm or loss . . . ." "Dangerous" means "able or likely to inflict injury or harm." Id.

We also note that before there was a separate statutory scheme applying specifically to insanity acquittees,[8] acquittees were treated no differently from persons who were otherwise involuntarily committed because of mental illness under the civil commitment statutes.[9] See *Warren* v. *Commissioner of Mental Health*, 43 Conn. App. 592, 594, 685 A.2d 332 (1996), cert. denied, 240 Conn. 901, 688 A.2d 331 (1997). Although the statutory scheme that applies to the confinement of insanity acquittees does not define the phrase "danger to himself or others," the statutory scheme pertaining to civil commitments does define that phrase. General Statutes § 17a-495 (a) and (b) provide in relevant part that " 'dangerous to himself or herself or others' means there is a substantial risk that physical harm will be inflicted by an individual upon his or her own person or upon another person . . . ."

We see no reason why the legislature would have employed nearly identical phrases in both the civil com-

---

[8] The statutory scheme that applies to insanity acquittees can be found at General Statutes §§ 17a-580 through 17a-603, inclusive.

[9] The civil commitment statutes are found in General Statutes §§ 17a-495 through 17a-528, inclusive.

mitment and the insanity acquittee commitment statutory schemes if it did not intend those phrases to have the same meaning. "[T]he legislature is presumed to exercise its statutory authority . . . with the intention of creating one consistent body of law. . . . An identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result." (Internal quotation marks omitted.) *In re Baby Z.*, 247 Conn. 474, 500, 724 A.2d 1035 (1999).

Further, the definition of "dangerous to himself or herself or others" contained in § 17a-495 (a) and (b) corresponds with the commonly approved usage of the terms "danger" and "dangerous," and is in keeping with the manner in which our Supreme Court has interpreted those terms. See, e.g., *State* v. *Lafferty*, 192 Conn. 571, 573, 472 A.2d 1275 (1984) ("we construe the term 'danger' according to the 'commonly approved usage of the language' ").

Our Supreme Court's interpretations of "danger" and "dangerous," as those terms are applied to the confinement, evaluation and release of an insanity acquittee, are of particular importance in this case because in determining whether a "statute is too vague and indefinite to constitute valid legislation we must take the statute as though it read precisely as the highest court of the State has interpreted it." (Internal quotation marks omitted.) *Kolender* v. *Lawson*, 461 U.S. 352, 355–56 n.4, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983).

In *State* v. *Putnoki*, 200 Conn. 208, 510 A.2d 1329 (1986),[10] our Supreme Court explained that "the determination of dangerousness in the context of a mental

---

[10] We note that in *Putnoki*, our Supreme Court interpreted "dangerousness" under the provisions of General Statutes § 53a-47, which is now contained in General Statutes §§ 17a-580 through 17a-603.

status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society. . . . [Although we recognize that medical opinion may inform the court's decision] [t]he 'awesome task' of weighing these two interests and arriving at a decision concerning release rests finally with the trial court. . . . In reaching its difficult decision, the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." (Citations omitted.) Id., 221.

We conclude that the ordinary meaning of the terms "danger" and "dangerous," the statutory definition set out in § 17a-495 (a) and (b) and our Supreme Court's interpretation of "dangerousness" provide Connecticut acquittees with fair warning of what "danger to himself or others" means for purposes of a § 17a-593 discharge application hearing, as well as the factors that a court may and should consider in making such a determination.

We also note that although the acquittee claims that the word "danger" is used in other than its ordinary sense because it "includes" danger to property, he provides no support for this contention. The terms "include" or "including" may be used to limit or expand the meaning of a word, or not. See *State* v. *DeFrancesco*, 235 Conn. 426, 434–35, 668 A.2d 348 (1995). We conclude, despite the acquittee's claim to the contrary, that the word "danger" is used in its ordinary sense for purposes of a § 17a-593 hearing, and the fact that its meaning has been expanded to include danger to the property of others does not change the meaning of the word, but simply makes the definition of the word

"danger" more inclusive. The meaning of the word "danger" is the same whether it relates to persons or property. In other words, under § 17a-593, an acquittee may not be discharged if, upon release, he would pose a danger to himself, to others, or to the property of others, as a result of his mental illness.

B

The acquittee next claims that § 17a-593 is unconstitutionally vague because it requires an acquittee to prove by a preponderance of the evidence that he is not mentally ill to such a degree that his mental condition "would constitute a danger to himself or others" in the community if discharged. He claims that this requirement is unconstitutionally vague because it places upon him the burden to prove something that is virtually impossible to prove, his own future conduct. We disagree.

"It is, of course, not easy to predict future behavior." *Jurek* v. *Texas*, 428 U.S. 262, 274, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). "Predictions of future dangerousness are difficult for both psychiatrists and the courts to make because of the 'inherent vagueness of the concept itself,' and such determinations must be dealt with by trial courts to a considerable extent on a case-by-case basis." *State* v. *Gates*, 198 Conn. 397, 403, 503 A.2d 163 (1986).

"The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment

to impose. For those sentenced to prison, these same predictions must be made by parole authorities." *Jurek* v. *Texas*, supra, 428 U.S. 274–75; see also *State* v. *Gates*, supra, 198 Conn. 403–404. Additionally, our probate courts must make assessments regarding the potential dangerousness of mentally ill individuals in the context of involuntary civil commitments. See generally General Statutes §§ 17a-497 through 17a-499. "What is essential is that the [trier of fact] have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek* v. *Texas*, supra, 276.

In the present case, the acquittee does not claim that § 17a-593 hinders an acquittee's ability to introduce such evidence; he simply claims that, regardless of the evidence introduced, an acquittee cannot meet his burden of proving that he would not pose a danger to himself or the community, if discharged, because future conduct is impossible to prove. We have already concluded that courts can and do make such determinations on a daily basis.

We also note that other courts have previously rejected similar arguments that it is impossible for an acquittee to meet his burden of proving that he will not constitute a danger upon discharge. See, e.g., *Glatz* v. *Kort*, 807 F.2d 1514, 1521 (10th Cir. 1986) (Colorado release procedures, which require insanity acquittee to prove that he has no abnormal condition that would likely cause him to be dangerous, not unconstitutionally vague because procedure merely requires court to predict future conduct of acquittee).

For all of the foregoing reasons, we conclude that the acquittee has failed to meet his burden of proving beyond a reasonable doubt that § 17a-593 is unconstitutionally vague. Accordingly, the acquittee has failed to satisfy the third prong of *Golding*, which requires that

a clear constitutional violation existed and, therefore, his claim fails.

## II

The acquittee next claims that the court's finding that he is currently mentally ill to such a degree that his discharge would constitute a danger to himself or others was not supported by the evidence adduced at the hearing and, therefore, the court's decision to dismiss his application for discharge was legally incorrect. We disagree.

The determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. See *State v. Warren*, 169 Conn. 207, 211–12, 363 A.2d 91 (1975). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority . . . is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." (Internal quotation marks omitted.) *In re Ebony H.*, 68 Conn. App. 342, 348 n.4, 789 A.2d 1158 (2002).

The acquittee claims that there was no evidence adduced at the hearing that tended to show that he was either currently mentally ill or dangerous.[11] In support

---

[11] The amicus curiae brief of the psychiatric defense unit of the division of public defender services goes a step further. It claims that the court improperly found that the acquittee was currently mentally ill because an Axis II diagnosis, i.e., a diagnosis of a personality disorder, is insufficient to constitute a mental illness upon which the state can justify continued commitment under § 17a-593. We conclude that it is unnecessary to consider this claim because there was evidence in the record, namely the testimony

of this contention he claims that Zeman and Selig, the psychiatrists who testified on his behalf at the hearing, stated that the acquittee is not currently mentally ill and does not present a danger to himself or others. He further claims that even Fox, the psychiatrist who testified on behalf of the state, indicated that the acquittee was not suffering from a psychotic illness and was not dangerous but that, in his opinion, the acquittee was not yet ready to be released from the jurisdiction of the board. We disagree with the acquittee's characterization of the testimony.

"Implicit in this argument are two assumptions: that the determination of dangerousness is a medical rather than a legal decision, and that the trial court was bound by the testimony and conclusions of the psychiatrists. Both assumptions are incorrect. Although a trial court may choose to attach special weight to the testimony of medical experts at a hearing to determine mental status, the ultimate determination of mental illness and dangerousness is a legal decision. . . . Partly because definitions of dangerousness are necessarily vague . . . and partly because there are no 'psychological or physical signs or symptoms which can be reliably used to discriminate between the potentially dangerous and the harmless individual' . . . psychiatric predictions of future dangerousness are tentative at best and are fre-

---

of Fox, that the acquittee carried both an Axis II and Axis I diagnosis, i.e., a diagnosis of a clinical illness.

Further, the Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) (DSM-IV), which the amicus relies on in its brief cautions the reader that there is an "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a 'mental disorder,' 'mental disability,' 'mental disease,' or 'mental defect.' In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM-IV diagnosis." DSM-IV, supra, p. xxiii.

quently conceded, even within the profession, to be unreliable." (Citations omitted.) *State* v. *Putnoki*, supra, 200 Conn. 219–20.[12]

"In addition, the goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. . . . While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence." (Citation omitted.) Id., 220–21.[13]

"Although psychiatric testimony as to the defendant's condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. . . . It may, in its discretion, accept all, part, or none of the experts' testimony." (Citations omitted.) Id., 221.

Accordingly, although the acquittee in the present case had two experts, Zeman and Selig, testify that he was not currently mentally ill and that he would not pose a danger to himself or others in the community if he were discharged from the jurisdiction of the board, as opposed to the state's one witness, the court was not bound to accept their testimony. "The [trier of fact] is at liberty to believe the testimony of any one witness against any number, or to weigh the evidence presented without regard to the number of witnesses who may testify to one particular fact, that is, without being con-

---

[12] "[B]oth the American Psychiatric Association . . . and the American Bar Association . . . have cautioned against the unfettered reliance in the criminal justice context on expert psychiatric predictions of future dangerousness as a predicate to the release from confinement of persons who have been adjudged guilty of, but not criminally responsible for, a criminal offense." (Citations omitted.) *State* v. *Putnoki*, supra, 200 Conn. 220.

[13] This conflict was evidenced in the present case by the testimony of Selig, who stated that the acquittee's treatment team's decisions regarding the acquittee were countertherapeutic and that they were holding him back.

trolled by the fact that more witnesses testify to one set of circumstances than to another." 1 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988) § 61d, p. 394. Here, the court specifically noted that the testimony of the acquittee's experts did not provide the court with enough confidence that the acquittee was no longer suffering from a mental disability. In addition, despite the acquittee's claim to the contrary, Fox did testify that the acquittee currently had an Axis I diagnosis that was just not manifesting itself at that time. According to Fox, the acquittee carried a diagnosis of depressive disorder, in remission, and polysubstance abuse, in a controlled environment. Fox also testified that the acquittee had an Axis II diagnosis, personality disorder. The court also noted that Fox had met with the acquittee on numerous occasions and that, of the three experts who testified at trial, Fox had met with the acquittee most recently. We also note that the acquittee conceded at oral argument before this court that he was mentally ill and required further therapy.

The record also reveals that at the hearing Zeman and the acquittee himself admitted that if discharged, the acquittee would still need further therapy. They both conceded, however, that after discharge the acquittee's submission to therapy would have to be on a voluntary basis because, at that point, the acquittee would no longer be under the jurisdiction of the board and it, therefore, could not require him to submit to therapy. Also, the court noted that the acquittee exhibited a lack of cooperativeness and that in light of that tendency, the court was not convinced that if released the acquittee would seek the therapy he admittedly needs.

The record reveals that the acquittee has had a long history of mental illness and hospitalization that first began when the acquittee was about fourteen years old, and that he has been institutionalized most of his life.

Also, there was evidence in the record that the incident that led to the acquittee's commitment, his attack on the nun, was precipitated by his ongoing depression and drug abuse. Fox testified that, in his opinion, the acquittee was not yet ready to cope with the day-to-day stress that he would face upon discharge and that it was stress that contributed to the acquittee's previous depression and drug abuse. Fox further testified that the acquittee needs structure and a gradual transition into the community and that he was concerned that if discharged now the acquittee would relapse. He also testified that if the acquittee did relapse and failed to seek therapy, he might again become depressed or abuse drugs. On the basis of this testimony, it was not unreasonable for the court to find that it was likely that if discharged, the acquittee might experience a relapse and that if he did experience a relapse but failed to seek the therapy he needs, he could again engage in the type of dangerous behavior that led to his commitment in the first place.

Furthermore, the court noted that all of the experts agreed that, to some extent, past behavior is a good indicator of future behavior. The record reveals that besides the incident that originally led to his commitment, while the acquittee was a resident at Norwich State Hospital, he tied another patient to a bed with bedsheets and then, in an effort to free him, lit the bedsheets on fire.[14] On another occasion, the acquittee attempted suicide. The acquittee testified that the suicide attempt was the result of stress he faced at a time when the board was attempting to transition him into the community and his first wife had filed for divorce. Although, as the acquittee points out, this conduct

---

[14] The acquittee testified that he tied the patient to the bed because the patient had assaulted his mother while she was at the hospital visiting. He further testified that when he attempted to free the patient, he discovered that he had tied the knots too tight and that is why he burned the sheets.

occurred many years prior to the hearing and the determination as to whether he should be discharged must be based on whether he is *currently* dangerous due to a mental illness, the acquittee's past violent behavior and the nature of the offense of which he was acquitted are not irrelevant factors in determining current dangerousness. See *State* v. *Putnoki*, supra, 200 Conn. 221–22.

The court specifically noted that the acquittee had made significant progress toward recovery and, consequently, was allowed to the leave the grounds of the hospital for extended periods of time to engage in employment and to visit with his wife. It also noted that the acquittee does not now require any psychotropic medications. Despite the court's recognition of these facts, it was not unreasonable for it to also take into consideration the fact that although the acquittee had not engaged in any dangerous conduct recently, this is due, in part, to the progress he has made since the time of his original commitment and, in part, to the fact that he has been confined, supervised and receiving treatment and, therefore, was less likely to do so.

We cannot conclude, on the basis of the record before us, that the court's finding that the acquittee is currently mentally ill to the extent that his discharge would constitute a danger to himself or others was clearly erroneous.

We also cannot conclude, on the basis of that finding, that the court's conclusion that the acquittee's application should be dismissed was legally incorrect. Section 17a-593 (g) requires the court to dismiss the application if it finds that the acquittee is not a person who should be discharged. The acquittee is a person who should be discharged if he does not have a mental disability to the extent that his discharge would pose a danger to himself or the community. See General Statutes § 17a-580 (11). In the present case, the evidence

adduced at the hearing amply supported the court's finding that the acquittee was currently mentally ill and dangerous. We, therefore, conclude that the court was legally and logically correct in concluding that the acquittee was not a person who should be discharged and that his application for discharge should be denied.

### III

The acquittee next claims that the court's finding that he was currently dangerous and mentally ill is in contravention of *Foucha* v. *Louisiana*, supra, 504 U.S. 71. We disagree.

In *Foucha* v. *Louisiana*, supra, 504 U.S. 71, the United States Supreme Court declared unconstitutional a Louisiana statute that allowed an insanity acquittee to be committed indefinitely to a mental institution until he was able to demonstrate that he was not dangerous to himself or others, despite the fact that he no longer suffered from any mental illness. Id., 75–85. The court reiterated the principle it first announced in *Jones* v. *United States*, supra, 463 U.S. 368, that, as a matter of due process, an acquittee is entitled to release when he either (1) recovered his sanity or (2) is no longer dangerous. *Foucha* v. *Louisiana*, supra, 77. The Connecticut Supreme Court has applied this principle, that as a matter of due process, an acquittee is entitled to be released when he has either recovered his sanity or is no longer dangerous. *State* v. *Metz*, 230 Conn. 400, 417–18, 645 A.2d 965 (1994).

### A

The acquittee first contends that the court's finding that he would pose a danger if discharged contravenes the holding in *Foucha* because none of the witnesses who testified at the hearing stated that the acquittee would constitute a danger to himself or others if discharged. We conclude that this claim is merely a

rehashing of the acquittee's previous claim that the court's finding of dangerousness was not supported by the evidence, a claim which we have already rejected in part II of this opinion.

Furthermore, we conclude that the holding in *Foucha* is inapplicable here because the factual circumstances underlying that case are readily distinguishable from the facts in the present case. First, unlike the Louisiana statute at issue in *Foucha*, which indefinitely allocated the burden of proving nondangerousness to the insanity acquittee; *Foucha* v. *Louisiana*, supra, 504 U.S. 81–82; the Connecticut statute at issue here, § 17a-593, fixes a definite period of time during which the acquittee must carry the burden of proving by a preponderance of the evidence that he is not dangerous, namely, until the maximum period of his commitment has expired. *State* v. *Metz*, supra, 230 Conn. 425. After that point, if the state seeks to continue the acquittee's commitment, it must then carry the burden of proving by clear and convincing evidence that the acquittee is mentally ill and dangerous. Id.

Second, the United States Supreme Court's holding in *Foucha* that continued confinement was violative of due process turned on the fact that the state had conceded that the acquittee was not mentally ill and that it was seeking to perpetuate his confinement *solely* on the basis that he was dangerous. *Foucha* v. *Louisiana*, supra, 504 U.S. 77–79. The court explained that an acquittee may properly be committed only when he is *both* mentally ill and dangerous and that once the acquittee's mental illness had disappeared, the state's basis for holding him in a psychiatric facility had also disappeared. Id., 76–80. Here, the court did not dismiss the acquittee's application for discharge solely on the basis that the acquittee would pose a danger if discharged. In addition to finding that the acquittee was dangerous, the court in the present case also found that

the acquittee remains mentally ill and that his potential dangerousness is due to that mental illness. Accordingly, we conclude that the holding in *Foucha*, that an acquittee who is dangerous but not mentally ill may not be confined in a psychiatric facility, is inapplicable to the facts of the present case.

### B

The acquittee next contends that the court's finding that he was mentally ill contravenes the holding in *Foucha* because his current diagnosis bears no reasonable relationship to his original acquittal and commitment because it is not the diagnosis that was the basis for that commitment. We disagree that *Foucha* requires a nexus between the acquittee's original diagnosis and his current commitment.

In *Foucha*, the court explained that "[d]ue process requires that *the nature* of commitment bear some reasonable relation to *the purpose* for which the individual is committed." (Emphasis added.) Id., 79. The purpose of the commitment "is to treat the individual's mental illness and protect him and society from his potential dangerousness." *Payne* v. *Fairfield Hills Hospital*, supra, 215 Conn. 683–84. Thus, as long as an acquittee has a mental illness that requires confinement for purposes of treatment and protection, his confinement to a psychiatric facility is reasonably related to the purpose of commitment and is, therefore, constitutional. *Foucha* v. *Louisiana*, supra, 504 U.S. 78–79.

It is true that the court should take into consideration the acquittee's past and present diagnoses in assessing dangerousness for purposes of a § 17a-593 discharge hearing. See *State* v. *Putnoki*, supra, 200 Conn. 221. We conclude, however, that the reason for doing so is not to assess whether the acquittee's diagnosis has remained constant throughout the length of his commitment but,

rather, to determine whether he still suffers from *a* mental illness.

It is not important that the mental illness that the acquittee is currently diagnosed with is different from the mental illness that led to his acquittal and confinement. Section 17a-593 (g), which requires the court to consider the protection of society as its primary concern at a discharge hearing, would make little sense if the court had to discharge an acquittee because his diagnosis had changed but where his current mental illness is equally as dangerous to himself or others as was his previously diagnosed mental illness. What is important is that the mental illness that the acquittee is currently diagnosed with be of the type of mental illness that might cause the acquittee to be dangerous if discharged. In other words, to justify continued commitment, the acquittee must be diagnosed with "a dangerous mental illness" because just as the state cannot, consonant with due process, commit an individual who is dangerous but not mentally ill; *Foucha* v. *Louisiana*, supra, 504 U.S. 75–84; it also cannot commit an individual who is mentally ill but not dangerous due to that mental illness. *O'Connor* v. *Donaldson*, 422 U.S. 563, 573–76, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975).

In the present case, the court concluded that the acquittee had been diagnosed with a mental illness, which illness might cause him to be a danger to himself or the community if he were discharged from the jurisdiction of the board. It is, therefore, inconsequential that the diagnosis the acquittee now carries may be different from his original diagnosis.

## IV

Finally, the acquittee argues that the court's conclusion that his application for discharge should be dismissed was improper because it was based on

information which was misinterpreted, false or absent from the record. This claim is wholly without merit.

The acquittee has simply "taken a shotgun approach in this appeal . . . and has assigned as error virtually all of the trial court's findings and conclusions." (Citation omitted.) *Vaiuso* v. *Vaiuso*, 2 Conn. App. 141, 145, 477 A.2d 678, cert. denied, 194 Conn. 807, 482 A.2d 712 (1984). A good number of these claims have already been considered and rejected in parts II and III, and, therefore, do not warrant independent consideration.

In addition, with respect to the acquittee's claim regarding the expert testimony at trial, "[t]he interpretation of testimony is the sole province of the trier and therefore objections to the findings which the [acquittee] wove into his claims of law will not be discussed. We cannot retry the case [and] . . . we are satisfied that the trial court's conclusions are supported by its findings." (Citations omitted.) *Hartford National Bank & Trust Co.* v. *Tucker*, 178 Conn. 472, 479–80, 423 A.2d 141 (1979), cert. denied, 445 U.S. 904, 100 S. Ct. 1079, 63 L. Ed. 2d 319 (1980).

We conclude, on the basis of the record before us, that the acquittee's wholesale attack on the court's findings and conclusions is merely an attempt to relitigate the case. We have already concluded in part II of this opinion that the factual findings of the court were supported by the evidence presented, and that its conclusions are legally and logically correct.

The judgment is affirmed.

In this opinion the other judges concurred.