******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
VINCENT ARDIZZONE
(AC 44238)

Prescott, Elgo and Flynn, Js.

*Syllabus*

The acquittee, who had been found not guilty of the crime of murder by reason of mental disease or defect, appealed to this court from the judgment of the trial court denying his application for discharge from the jurisdiction of the Psychiatric Security Review Board. *Held* that the trial court properly denied the acquittee's application for discharge from the jurisdiction of the board, the record having contained evidence to support the court's finding that if the acquittee were to be discharged, he would constitute a danger to himself or others: in its memorandum of decision, the court indicated that it had considered the relevant evidence in light of the entire record available to it, including testimony of various medical professionals and the acquittee and the board's written report, evidence that chronicled, inter alia, the acquittee's history of rule breaking behavior, which contributed to his decompensation in supervised settings, and, in light of that evidence, the court reasonably could have inferred that, if the acquittee became noncompliant with his treatment plan, his mental illness likely would return to a florid state and he would present a danger to himself and others; moreover, even though the court expressly acknowledged testimony from certain witnesses that the acquittee willingly accepted treatment and acknowledged the importance of continuing to take his medication as prescribed, the court, as the fact finder, was free to find other testimony more compelling; furthermore, contrary to the acquittee's claims that the trial court relied solely on a misunderstanding in a treatment provider's testimony and improperly relied on the board's report, this court was not persuaded that the court's conclusion with respect to certain expert testimony violated law, logic, or reason, or otherwise was inconsistent with the subordinate facts of the case, and its reliance on the board's report was proper, as the report included a summary of the acquittee's status, treatment, and actions from the date of his initial commitment to the date the report was filed, a period of nearly twenty-seven years.

Argued February 7—officially released October 18, 2022

*Procedural History*

Application for discharge from the jurisdiction of the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Ansonia-Milford and tried to the court, *Brown, J.*; judgment denying the application, from which the acquittee appealed to this court. *Affirmed.*

*J. Patten Brown III*, for the appellant (acquittee).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, was *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Opinion*

ELGO, J. The acquittee,[1] Vincent Ardizzone, appeals from the judgment of the trial court denying his application for discharge from the jurisdiction of the Psychiatric Security Review Board (board). On appeal, the acquittee claims that there is no evidence in the record to support the court's finding that he suffered from a qualifying mental illness that caused him to be a danger to himself or others. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. The acquittee killed his father on November 29, 1991, as a result of a delusional belief that his father was molesting his daughter. On January 12, 1993, the acquittee was found not guilty of the charge of murder by reason of mental disease or defect pursuant to General Statutes § 53a-13.[2]

On March 5, 1993, the acquittee was committed to the jurisdiction of the board for a period not to exceed thirty-five years. At the time of his commitment, the acquittee had been diagnosed with schizophrenia, was experiencing psychotic symptoms, was abusing alcohol, and was not complying with psychiatric treatment. That term of commitment is due to expire on March 4, 2028.

At the beginning of his confinement, the acquittee was committed to a maximum security facility and initially was reported to be progressing well. A report from that facility dated February 25, 1994, indicated that the acquittee had involved himself in therapeutic opportunities and maintained good relationships with the treatment teams. On July 17, 1994, however, the acquittee was placed in four point restraints after threatening staff. Although the acquittee thereafter was observed talking to himself and the walls, he nonetheless claimed that he no longer was ill and that he never had suffered from schizophrenia. A subsequent report from the facility in August, 1994, indicated that the acquittee had stopped taking his medication, was experiencing symptoms of psychosis, and had engaged in inappropriate behavior and sexual improprieties that resulted in his transfer to a different facility unit.

Approximately six months later, in February, 1995, the acquittee was placed in three hours of locked seclusion due to disruptive behavior. A report from the facility to the board, dated July, 1995, indicated that, although the acquittee had requested transfer to a less restrictive facility, he continued to refuse psychiatric medication and remained in "total denial of his mental illness and the existence of symptoms of mental illness." (Internal quotation marks omitted.)

Over the next two years, the acquittee began to show progress in his mental health treatment. He agreed to resume his psychotropic medication and his participa-

tion in treatment groups was described as "candid" and "forthcoming." In light of that progress, the acquittee was transferred to a less restrictive facility on August 20, 1998.

In a report issued approximately one year later, the board found that the acquittee had exhibited a lack of insight into his crime and his mental illness. The board noted that the acquittee continued to minimize his crime and believed that he had been cured of his mental illness for at least four years.

In 2000, two reported incidents occurred involving the acquittee and his girlfriend. In January, the acquittee and his girlfriend impermissibly engaged in sexual activity in a visitor's room at the hospital facility. In April, the girlfriend reported that the acquittee had made harassing telephone calls to her. Thereafter, the acquittee's privilege level was reduced due to an increased risk of his leaving the facility without permission.

In January, 2001, the facility reported to the board that the acquittee had displayed difficulty adhering to rules and regulations of the facility and had struggled to be open and honest with his treatment team. The following month, the acquittee's privilege level was placed on hold after he made an inappropriate and sexually suggestive comment to a female patient. In March, 2001, the acquittee admitted to sending money to women in exchange for written letters and phone conversations, as well as provocative photographs. Further, the acquittee shared sexually explicit materials with two male patients in violation of facility policy.

On December 14, 2001, the board held a hearing to review the status of the acquittee, which was continued to May 3, 2002. The testimony adduced at that hearing indicated that the acquittee had displayed significant difficulty in all treatment aspects. The testimony revealed that the acquittee had sent a letter intended for his daughter, in violation of both the facility's mail policy and the acquittee's divorce decree, which forbade any contact between the acquittee and his daughter. Testimony at the hearing also indicated that the acquittee continued to violate the facility's policies regarding sexual relationships and that he appeared superficially highly functioning and socially adept but had demonstrated a "consistent level of inappropriate behaviors that now required him to be transferred to a more secure unit." Paul Amble, a forensic psychiatrist for Connecticut Valley Hospital, testified at the hearing that the acquittee had displayed a level of character pathology and poor impulse control, and that he presented a danger to vulnerable patients. The acquittee thereafter was transferred to a maximum security facility on December 14, 2001.

In the following years, the acquittee was transferred

between maximum security and less restrictive confinement on a near yearly cycle. Transfers to a less restrictive confinement were based on treatment progress made during periods of maximum security confinement. Once the acquittee was returned to a less restrictive confinement, however, he resumed rule breaking behaviors, including sexual impropriety, gambling, selling cigarettes to other patients, and assaultive behavior.

On June 22, 2006, the facility reported that the acquittee was psychiatrically stable and taking prescribed medication. That report detailed the acquittee's goals for treatment, including "full acceptance of his mental illness, an analysis of risk factors for emotional and behavioral decompensation as well as those for substance abuse and gambling." The report concluded that, although the acquittee was medically compliant and had attained a good degree of clinical stability, "his own personality and characterological issues will need to be monitored to assure that his behavior is conforming to the unit rules." Six months later, on January 9, 2007, the acquittee filed an application in a self-represented capacity for discharge from the jurisdiction of the board, but this application ultimately was withdrawn.

Following a review hearing in August, 2007, at which the board found the acquittee clinically stable despite the fact that he continued to loan money to other patients against staff advice, the acquittee was granted temporary leave to visit with friends and family twice per month. At a subsequent hearing on March 20, 2009, the board heard testimony that the acquittee had used his temporary leave to visit with family members, had taken his medication, and had not displayed any episodes of violence. The testimony also revealed, however, that the acquittee's participation in recommended treatment activities was "selective" and that he continued to violate facility rules by loaning a large amount of money to a relative. At a status review hearing held months later, the board granted temporary leave for the acquittee to participate in day treatment services in the community four days per week.

In March, 2011, the board held another hearing to consider further temporary leave for the acquittee. At this hearing, it was discovered that the acquittee had engaged in numerous episodes of rule breaking behavior while attending day treatment in the community, including sexual impropriety and accruing significant credit card debt of approximately $14,000. The board subsequently voted to transfer the acquittee to the Community Mental Health Center in New Haven for day treatment service that provided more structure and a higher level of supervision.

In December, 2011, the board denied the facility's request to allow the acquittee to have overnight visits in the community based on testimony from medical

experts. Significantly, in the nine months since the previous status hearing, the acquittee had increased his credit card debt to approximately $17,000. The board thus concluded that financial stress was a risk factor for psychiatric decompensation due to the acquittee's history of impulsive behavior, poor decision making, and increased risk if transitioned to a setting with decreased supervision and monitoring.

At a subsequent hearing on May 31, 2013, the acquittee's treatment providers testified that he was an active member in his treatment groups and individual therapy. The acquittee was reported to have made good progress and had no deterioration of his mental state. Although the acquittee had continued to engage in rule violations, his providers testified that he had not engaged in violent or threatening behaviors. In light of his treatment progress, the acquittee was permitted to transition to a residential program and reside overnight in the community with continued supervision and treatment.

On August 21, 2015, the board held another review hearing at which the board determined that, despite attending treatment sessions and remaining clinically stable, the acquittee's temporary leave had been suspended several times due to his borrowing money from friends, some under false premises, using another individual's Electronic Benefits Transmission card to make cash withdrawals, and purchasing lottery tickets in violation of the terms of his temporary leave. Despite these continued rule violations, the board allowed the acquittee to remain in the community on temporary leave, noting that he remained clinically stable and his community providers were committed to providing increased supervision and monitoring.

Following a review hearing in May, 2016, the board terminated the acquittee's temporary leave privileges due to his violation of the terms of a prior decision of the board. In so doing, the board noted that the acquittee had transitioned from committing technical violations of those terms to committing more serious violations involving untruthfulness. Specifically, the acquittee had begun a relationship with a female with recent criminal convictions and pending charges and had allowed her to stay overnight in his apartment in violation of his temporary leave rules. The acquittee was not forthcoming about this relationship with his treating psychiatrist and later reported that, despite understanding the rules about visitors, the acquittee was "unable to delay his gratification" and "wished to pursue a relationship with the female friend and his desire to be in a relationship overwhelmed his need to follow" those rules.

On February 28, 2018, in accordance with General Statutes § 17a-593 (a), the acquittee filed an application with the court seeking discharge from the jurisdiction of the board. In response, the board held a hearing on

April 20, 2018, to review the acquittee's status and to prepare a report to the court regarding his application for discharge. At that hearing, the board was presented with evidence of several instances of rules violations by the acquittee following the May, 2016 termination of his temporary leave. Specifically, a consulting forensic psychologist testified that the acquittee had attempted to pay another patient to assault his treating psychiatrist, had attempted to purchase cigarettes against hospital rules, and had attempted to make contact with his daughter. The medical service director of the facility testified that the acquittee had informed her that he did not want to live under any kind of rules that might typically accompany temporary leave. The director further testified that the acquittee could receive treatment from the local mental health agency, but it was unclear whether he would collaborate with the agency. Furthermore, the director noted that the acquittee's living situation would be "uncertain and unmonitored, and that he would be at risk for making poor life decisions, as he did not want to live under the authority of others." Following the hearing, the board voted to recommend that the court deny the acquittee's application for discharge. The trial court then held a hearing on that application, which it subsequently denied on November 19, 2018.

On October 4, 2019, the board held a hearing to review the acquittee's status and to consider the facility's application for temporary leave. Testimony established that the acquittee's psychotic symptoms from the time of the offense that led to his arrest, including paranoia and auditory hallucinations, were in remission. Testimony at the hearing nonetheless demonstrated that the acquittee had continued his rule breaking behavior and that it was "unlikely that [the acquittee] could comply with the rules set for him and would more likely continue to challenge some rules." After considering the testimony, the board denied the request for temporary leave. It is undisputed that the acquittee's diagnoses at that time included schizophrenia in full remission (principal diagnosis), other specified personality disorder with antisocial and borderline traits, tobacco use disorder (severe), gambling disorder (persistent), and alcohol use disorder in sustained remission.

On November 19, 2019, the acquittee filed in the Superior Court another application for discharge from the jurisdiction of the board. The board thereafter prepared and filed a "Report to Court Re: Application for Discharge" (report) on December 19, 2019. In that report, the board recommended that the court deny the application due to (1) the acquittee's continued demonstration of "blatant indifference to safeguards, rules, and stipulations designed to promote his recovery and prevent his involvement in activities that may reactivate his risk factors"; (2) the lack of evidence that the acquittee had incorporated "lessons learned from his previous

community failures"; (3) the acquittee's inability to "discern what is in his best interest and what behaviors may pose a risk to him" and his continued justification of his "refusal to follow stipulations simply because he does not believe that they should apply to him"; (4) the acquittee's exploitation of his disabled sister for monetary gain and in circumvention of his conservator; (5) notwithstanding his diagnosis of persistent gambling disorder, the acquittee's characterization of himself as a "recreational" gambler, which evinced a "lack of appreciation and understanding of his history of financial mismanagement including gambling and excessive overspending"; (6) the "correlation between financial and relationship stressors on [the acquittee's] psychotic episodes," and that the acquittee's behaviors such as gambling, excessive spending, deceitfulness and involvement in secretive romantic relationships, "while not illegal, are known risk factors for his decompensating and reoffending"; and (7) the inability of the acquittee's treatment providers to "understand the origins and motivations for [his] repeated engagement in self sabotaging behavior, thereby limiting appropriate interventions for his antisocial traits and conceding that the same behavior would continue." The board thus concluded in its report that, due to the acquittee's failure to conform his behavior appropriately in supervised settings, his "behavior in a nonsupervised setting would deteriorate, increasing his risk for treatment noncompliance. Therefore, the board finds that [the acquittee] cannot reside safely in the community without board oversight and should remain under the supervision and jurisdiction of the board."

In January, 2020, the acquittee's then current facility provided an updated report to the board on his mental condition, treatment progress, and current assessment of his risk. Although the acquittee's mental condition and treatment remained clinically stable, he had been diagnosed with stage IV prostate cancer and was undergoing treatment. In the risk assessment provided in that report, the facility stated that the acquittee remained clinically stable and free of psychotic symptoms on his medication regimen and had collaborated to make changes in his medications to address his impulsivity and smoking. The facility also noted that the acquittee recently had engaged in improper sexual activity with another patient, but thereafter complied with facility rules after that conduct was reported. The assessment indicated that the acquittee's "insight, judgment, and impulse control remain limited in circumstances [in which] his immediate desires overwhelm his ability to delay gratification, and he continues to struggle with following rules that he deems unnecessary to maintaining his psychiatric stability." The facility reported that the acquittee remained open and willing to understanding his rule breaking behaviors in individual therapy, but ultimately declined to recommend any change

in the acquittee's status to the board.

On March 3, 2020, the trial court held an evidentiary hearing on the acquittee's application for discharge from the jurisdiction of the board, at which several witnesses, including the acquittee, testified. In its subsequent memorandum of decision dated July 2, 2020, the court found that the acquittee had "failed to demonstrate by a preponderance of the evidence that he is a person who should be discharged." In so doing, the court noted that it was "required to make a finding as to the mental condition of the acquittee, considering that the court's primary concern is the protection of society." The court then specifically found that "the acquittee is still unable to conform his behavior appropriately in supervised settings. The court . . . concurs with the board's findings that the acquittee's behavior in a nonsupervised setting would deteriorate [and increase] his risk for treatment noncompliance." The court thus concluded that the acquittee should remain under the board's jurisdiction and, accordingly, denied the application for discharge. This appeal followed.

On appeal, the acquittee claims that the court improperly denied his application for discharge. He argues that there is no evidence in the record to support the court's determination that he continues to pose a danger to himself or others. The state, by contrast, contends that the court properly concluded that the acquittee had not satisfied his burden of demonstrating, by a preponderance of the evidence, that he should be discharged. We agree with the state.

As a preliminary matter, we note that "the confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." (Internal quotation marks omitted.) *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 683–84, 578 A.2d 1025 (1990). "[A]s a matter of due process, an acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." *State* v. *Metz*, 230 Conn. 400, 417–18, 645 A.2d 965 (1994); see also *Foucha* v. *Louisiana*, 504 U.S. 71, 77, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992); *Jones* v. *United States*, 463 U.S. 354, 368, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983).

As our Supreme Court has explained, "[a]fter an acquittee has applied for discharge from the board's jurisdiction and the board . . . has filed its report regarding whether the acquittee should be discharged,

the trial court must hold a hearing on the application, at which the acquittee bears the burden of proving that he or she is a person who should be discharged."[3] (Internal quotation marks omitted.) *State* v. *March*, 265 Conn. 697, 705, 830 A.2d 212 (2003); see also *State* v. *Metz*, supra, 230 Conn. 421 n.15 (observing that § 17a-593 (f) "plainly indicates [that the legislature] intended to place the burden of proof on an acquittee . . . with respect to applications for discharge").

"After the hearing, the court, considering that its primary concern is the protection of society, must make a finding as to whether the acquittee is a person who should be discharged. . . . The term [p]erson who should be discharged is defined as an acquittee who does not have psychiatric disabilities . . . to the extent that his discharge would constitute a danger to himself or others . . . ." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *March*, supra, 265 Conn. 705. That determination of dangerousness presents a question of fact for the court to resolve. Id., 711; see also *State* v. *Lafferty*, 189 Conn. 360, 363, 456 A.2d 272 (1983). Accordingly, appellate review of a court's dangerousness determination is governed by the clearly erroneous standard. See *State* v. *March*, supra, 711–12; *State* v. *Jacob*, 69 Conn. App. 666, 680, 798 A.2d 974 (2002). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority . . . is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." (Internal quotation marks omitted.) *State* v. *Jacob*, supra, 680.

On appeal, the acquittee claims that the court's dangerousness determination is clearly erroneous. Although the acquittee asserts that there is no evidentiary basis for the court's dangerousness determination, the record belies that claim. In its memorandum of decision, the court indicated that it had considered the testimony of various medical professionals, the acquittee, and the board's written report. That evidence chronicled the acquittee's history of rule breaking behavior, as previously detailed in the statement of facts, which has contributed to his decompensation in supervised settings. The court also credited the board's submission in its written report that the acquittee "has continued to demonstrate a blatant indifference to safeguards, rules, and stipulations designed to promote his recovery and prevent his involvement in activities that may reactivate his risk factors"; that the acquittee's "judgment remains compromised as he continues to be unable to discern what is in his best interest and what

behaviors may pose a risk to him"; and that there was a "correlation between financial and relationship stressors on [the acquittee's] psychotic episodes. . . . [T]he many instances when [the acquittee] engaged in behaviors such as gambling, excessive spending, deceitfulness, and involvement in secretive romantic relationships . . . are known risk factors for his decompensating and reoffending." The court, as trier of fact, was entitled to credit that evidence. See *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007) ("[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" (internal quotation marks omitted)). In light of that evidence, the court reasonably could infer that, if the acquittee became noncompliant with his treatment plan, his mental illness likely would return to a florid state and he would present a danger to himself and others.

The acquittee nevertheless argues that there was testimony presented at the hearing that he would continue his medication and treatment if discharged from board jurisdiction. For that reason, he claims that *State* v. *Corr*, 87 Conn. App. 717, 867 A.2d 124, cert. denied, 273 Conn. 929, 873 A.2d 998 (2005), is distinguishable from the present case. We do not agree.

In *Corr*, the trial court dismissed an acquittee's application for discharge from the jurisdiction of the board. Id., 719. Like the acquittee in the present case, the acquittee in *Corr* did not "contest that he is a person who suffers from a psychiatric disability" and his appeal rested "solely on whether the court properly found that he failed to meet his burden of proving that he is a person who should be discharged." Id., 721. In rejecting that claim, this court distinguished the decision of the United States Court of Appeals for the Sixth Circuit in *Levine* v. *Torvik*, 986 F.2d 1506 (6th Cir.), cert. denied, 509 U.S. 907, 113 S. Ct. 3001, 125 L. Ed. 3d 694 (1993), in which "all of the evidence demonstrated that the acquittee was no longer mentally ill or dangerous at the time of the discharge hearing." *State* v. *Corr*, supra, 87 Conn. App. 730. This court then noted that, rather than basing its decision on a past diagnosis, the trial court had "looked at the record in its entirety and concluded that the acquittee should not be discharged from the board's jurisdiction. Furthermore, unlike the situation in *Levine*, in which the acquittee did not require the use of medication to control his illness . . . the uncontroverted testimony at the hearing was that if the acquittee stopped using his medication, he would be a danger to himself or to others." Id. This court thus held that the trial court's dangerousness determination was not clearly erroneous in light of the uncontroverted testimony that the acquittee relied on medication to remain clinically stable. Id.

In the present case, the trial court expressly acknowl-

edged testimony from certain witnesses that the acquittee willingly accepted treatment and that the acquittee acknowledged the importance of continuing to take his medication as prescribed. The court, however, emphasized that several witnesses testified to the acquittee's refusal to follow certain rules and his rule breaking behavior, and the court credited that testimony. Moreover, the court expressly credited testimony from one expert who opined that "the acquittee could not help himself regarding the violation of hospital rules . . . ." As sole arbiter of credibility, the court was free to find that testimony more compelling. See, e.g., *State* v. *Nowell*, 262 Conn. 686, 696, 817 A.2d 76 (2003) ("testimony was for the trial court to assess and [appellate courts have] no appropriate role at this level in determining which of the various witnesses to credit").

In addition, the court credited certain statements contained in the report, which it is entitled to do. See, e.g., *State* v. *Damone*, 148 Conn. App. 137, 174, 83 A.3d 1227 (board free to reject expert testimony presented by acquittee on question of dangerousness "in favor of the findings of the board" as set forth in written report), cert. denied, 311 Conn. 936, 88 A.3d 550 (2014). In particular, the court credited the statement that the acquittee's "[b]latant indifference to safeguards, rules, and stipulations designed to promote his recovery and prevent his involvement in activities . . . may reactivate his risk factors." (Internal quotation marks omitted.) The court also noted the board's concern that the acquittee's judgment "remains compromised as he continues to be unable to discern what is in his best interest and what behaviors may pose a risk to him. He continues to justify his refusal to follow stipulations simply because he does not believe that they should apply to him."

A review of the court's memorandum of decision demonstrates that the court in the present case, like the trial court in *Corr*, looked at the record in its entirety to evaluate the acquittee's risk factors to reach its conclusion and did not base its dangerousness determination on a "mere possibility"; (emphasis omitted) *State* v. *Corr*, supra, 87 Conn. App. 733; that the acquittee may become dangerous if he were to be released from the board's custody, but rather on testimonial and documentary evidence. Moreover, as in *Corr*, the court considered the acquittee's history of failing to take his medication and his continued rule breaking behavior in making its dangerousness determination. The acquittee's attempt to distinguish this case from *Corr*, therefore, is unavailing.

The acquittee also argues that the court improperly "ignor[ed] all of the experts who have treated [the acquittee] for years who testified about the inconsequential nature [of his rule] violations." The acquittee relatedly argues that the court relied on a single disposi-

tive factor in making its dangerousness determination by misconstruing Amble's testimony. We do not agree.

As this court has observed, "psychiatric predictions of future dangerousness are tentative at best and are frequently conceded, even within the profession, to be unreliable. . . . Consequently, both the American Psychiatric Association . . . and the American Bar Association . . . have cautioned against the unfettered reliance in the criminal justice context on expert psychiatric predictions of future dangerousness as a predicate to the release from confinement of persons who have been adjudged guilty of, but not criminally responsible for, a criminal offense.

"In addition, the goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. . . . While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence. As a result, the determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society. . . . The awesome task of weighing these two interests and arriving at a decision concerning release rests finally with the trial court. . . .

"Although psychiatric testimony as to the [acquittee's] condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. . . . It may, in its discretion, accept all, part, or none of the experts' testimony." (Internal quotation marks omitted.) *State* v. *Corr*, supra, 87 Conn. App. 75; see also *Song* v. *Collins*, 152 Conn. App. 373, 376, 97 A.3d 1024 (2014) (finder of fact is "free to disbelieve, in whole or in part, the testimony of either or both of the expert witnesses who testified at trial").

Accordingly, even if the evidence in the record supported the acquittee's contention that the trial court "ignor[ed] all of the experts" with respect to their testimony as to the "inconsequential nature [of his rule] violations," it remained within the discretion of the trial court, as the trier of fact, to credit or discredit such evidence.

Moreover, the acquittee's contention that the court relied solely on a misunderstanding of Amble's testimony is not supported by the record.[4] It is a misstatement of the record to assert that Amble's testimony was the sole basis for the court's dangerousness determination. In its memorandum of decision, the court summarized the testimony of five expert witnesses, the acquittee's cousin, and the acquittee himself as a basis for the decision, as well as the board's report. Although the acquittee appears to believe, based on his own

understanding, that the court misconstrued Amble's testimony when the court summarized the content of his testimony in its memorandum of decision, our precedent requires that we credit the fact finder's conclusions as not erroneous "unless they violate law, logic or reason or are inconsistent with the subordinate facts." *State* v. *Warren*, 169 Conn. 207, 213, 363 A.2d 91 (1975). We are not persuaded that the court's conclusion with respect to that testimony has violated law, logic, or reason, or otherwise was inconsistent with the subordinate facts of the case.

The acquittee also contends that the court's reliance on the board's report was improper. He argues that the report is not "competent evidence," that the board relied on the acquittee's prior conduct without consideration of pertinent information about his current conduct, and that the report was written by individuals other than his treatment providers.

The acquittee's arguments that the report is not competent evidence and that the board relied on his prior conduct without considering pertinent current information fail for the same reason. As the acquittee acknowledges, the report provided information on his past actions. It included a summary of the acquittee's status, treatment, and actions from the date of his initial commitment in March, 1993, to December 19, 2019, the date the report was filed. In reaching its dangerousness determination, the trial court expressly and appropriately relied on the information contained in the report.

Our precedent recognizes that it is difficult, both for psychiatrists and the court, to make predications on future dangerousness because of the "inherent vagueness of the concept itself . . . ." (Internal quotation marks omitted.) *State* v. *Jacob,* supra, 69 Conn. App. 678. Thus, "[t]he ultimate determination of mental illness and dangerousness is a legal decision [entrusted to the court] . . . in which the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Dyous*, 198 Conn. App. 253, 273, 233 A.3d 1138, cert. denied, 335 Conn. 948, 238 A.3d 17 (2020). In making its dangerousness determination, the court properly considered the relevant information in light of the "entire record available to it"; (emphasis omitted; internal quotation marks omitted) id.; including but not limited to the summary set forth in the report of the acquittee's behavior while in confinement—both past and more recent—and the assessments of his past and recent actions.

Also without merit is the acquittee's contention that the report was created by individuals personally unfa-

miliar with the acquittee. The report contained information provided by the acquittee's treatment providers, including multiple experts who testified at the evidentiary hearing before the trial court and who previously had provided treatment to the acquittee. Further, it is established in our case law that, "[u]nder the acquittee statutory scheme, the board possesses general and specific familiarity with all acquittees and is better equipped than the courts to monitor their commitment." Id., 269. In light of the foregoing, we conclude that the court properly relied on the report in making its dangerousness determination.

In the present case, we reiterate that the acquittee bore the burden of demonstrating that he is a person who should be discharged. See *State* v. *March*, supra, 265 Conn. 705. The record before us contains evidence to support the court's finding that, if the acquittee was discharged, he would constitute a danger to himself or others. That finding, therefore, is not clearly erroneous. Because the acquittee did not satisfy his statutory burden of proof; see General Statutes § 17a-593 (f); the court properly denied his application for discharge from the jurisdiction of the board.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Pursuant to General Statutes § 17a-580 (1), the term "[a]cquittee" refers to a defendant who was found not guilty by reason of mental disease or defect in a criminal proceeding pursuant to General Statutes § 53a-13.

[2] General Statutes § 53a-13 provides in relevant part: "(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. . . ."

[3] General Statutes § 17a-593 (f) provides in relevant part that, at a hearing on an application for discharge, "the acquittee shall have the burden of proving by a preponderance of the evidence that the acquittee is a person who should be discharged."

[4] In its memorandum of decision, the court summarized Amble's testimony as follows: "[Amble] testified he was aware the acquittee was previously offered a temporary leave but refused to accept it due to his inability to comply with all of the hospital's rules. [Amble] stated he would be concerned that if the acquittee were discharged from the board's oversight there would be no one to order the acquittee's compliance with said orders; he also testified that such a situation could pose a threat to the acquittee's safety or the safety of others. He also testified that, based on the acquittee's history at the hospital, and his willingness to accept treatment, he opine[d] the acquittee will more than likely continue his treatment in the community."