******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.*
## VINCENT ARDIZZONE
### (AC 46442)

Seeley, Westbrook and Palmer, Js.

*Syllabus*

The acquittee appealed from the judgment of the trial court denying his application for discharge from the jurisdiction of the Psychiatric Security Review Board pursuant to statute (§ 17a-593). He claimed, inter alia, that the court improperly found that, if he were discharged, he would present a danger to himself or others. *Held*:

The trial court properly determined that the acquittee was not a person who should be discharged from the jurisdiction of the Psychiatric Security Review Board, as the court's finding that, if discharged, the acquittee would constitute a danger to himself or others was not clearly erroneous.

The acquittee's claim that § 17a-593, as applied to him, was unconstitutionally vague was unavailing because he failed to meet his burden of proving beyond a reasonable doubt that he had inadequate notice that noncompliance with the rules of his treating hospital could result in a denial of his application for discharge, as a reasonable person would have anticipated that the trial court would consider his noncompliance with hospital rules when making a determination of dangerousness pursuant to § 17a-593, and the acquittee was aware of the rules and that the rules were intended to mitigate his risk of dangerousness.

The acquittee failed to meet his burden of proving beyond a reasonable doubt that he was the victim of arbitrary and discriminatory enforcement of § 17a-593, as the trial court reached its dangerousness conclusion on the basis of evidence in the record of the acquittee's severe and repetitive noncompliant behavior, which was associated with risk factors for decomposition and dangerousness.

Argued November 12, 2024—officially released January 21, 2025

*Procedural History*

Application for discharge from the jurisdiction of the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Ansonia-Milford and tried to the court, *Dennis, J.*; judgment denying the application, from which the acquittee appealed to this court. *Affirmed.*

*James B. Streeto*, senior assistant public defender, for the appellant (acquittee).

*Meryl R. Gersz*, assistant state's attorney, with whom, on the brief, was *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Opinion*

WESTBROOK, J. The acquittee,[1] Vincent Ardizzone, appeals from the judgment of the trial court denying his application for discharge from the jurisdiction of the Psychiatric Security Review Board (board) in accordance with General Statutes § 17a-593 (a).[2] On appeal, the acquittee claims that (1) the court improperly found that, if he were discharged, he would present a danger to himself or others and (2) § 17a-593 is unconstitutionally vague as applied to him.[3] We disagree and, accordingly, affirm the judgment of the trial court.

[1] Pursuant to General Statutes § 17a-580 (1), the term "acquittee" refers to a defendant who was found not guilty by reason of mental disease or defect in a criminal proceeding pursuant to General Statutes § 53a-13.

[2] General Statutes § 17a-593 (a) provides in relevant part: "The board . . . may recommend to the court the discharge of the acquittee from custody or the acquittee may apply directly to the court for discharge from custody. . . ."

[3] The acquittee additionally claims that the court improperly admitted the board's May 4, 2021 "Report to Court Re: Application for Discharge" as evidence because it (1) contains inadmissible hearsay and (2) violates his due process rights. In his appellate brief, the acquittee acknowledges that *State* v. *Harris*, 277 Conn. 378, 394, 890 A.2d 559 (2006) (holding that board's report did not contain inadmissible hearsay, and its admission did not violate due process), and *State* v. *Warren*, 100 Conn. App. 407, 424, 919 A.2d 465 (2007) (same), are binding on this court. He claims that "[t]his issue is being raised for the sake of future review" by our Supreme Court. Because, "[a]s an intermediate appellate court, we are bound by Supreme Court precedent and are unable to modify it"; (internal quotation marks omitted) *State* v. *Gonzalez*, 214 Conn. App. 511, 522 n.10, 281 A.3d 501, cert. denied, 345 Conn. 967, 285 A.3d 736 (2022); and "this court's policy dictates that one panel should not, on its own, reverse the ruling of a previous panel"; (internal quotation marks omitted) *State* v. *Dayvid J.*, 227 Conn. App. 755, 760, 322 A.3d 1126, cert. denied, 350 Conn. 919, 325 A.3d 218 (2024); the acquittee cannot prevail on his evidentiary and constitutional claims concerning the court's alleged improper admission into evidence of the May 4, 2021 "Report to Court Re: Application for Discharge."

This court's opinion in *State* v. *Ardizzone*, 215 Conn. App. 854, 283 A.3d 982 (2022), cert. denied, 346 Conn. 905, 287 A.3d 1089 (2023), in which we affirmed the trial court's denial of a prior application for discharge by the acquittee, and the present administrative record set forth the following relevant facts and procedural history. "The acquittee killed his father on November 29, 1991, as a result of a delusional belief that his father was molesting his daughter. On January 12, 1993, the acquittee was found not guilty of the charge of murder by reason of mental disease or defect pursuant to General Statutes § 53a-13.[4]

"On March 5, 1993, the acquittee was committed to the jurisdiction of the board for a period not to exceed thirty-five years. At the time of his commitment, the acquittee had been diagnosed with schizophrenia, was experiencing psychotic symptoms, was abusing alcohol, and was not complying with psychiatric treatment. That term of commitment is due to expire on March 4, 2028.

"At the beginning of his confinement, the acquittee was committed to a maximum security facility and initially was reported to be progressing well. . . . On July 17, 1994, however, the acquittee was placed in four point restraints after threatening staff. . . . [T]he acquittee had stopped taking his medication, was experiencing symptoms of psychosis, and had engaged in inappropriate behavior and sexual improprieties that resulted in his transfer to a different facility unit. . . .

"Over the next two years, the acquittee began to show progress in his mental health treatment. He agreed to

---

[4] "General Statutes § 53a-13 provides in relevant part: '(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. . . .' " *State* v. *Ardizzone*, supra, 215 Conn. App. 856 n.2.

resume his psychotropic medication and his participation in treatment groups was described as candid and forthcoming. In light of that progress, the acquittee was transferred to a less restrictive facility on August 20, 1998.

"In a report issued approximately one year later, the board found that the acquittee had exhibited a lack of insight into his crime and his mental illness. The board noted that the acquittee continued to minimize his crime and believed that he had been cured of his mental illness for at least four years.

"In 2000 . . . the acquittee and his girlfriend impermissibly engaged in sexual activity in a visitor's room at the hospital facility . . . [and] the girlfriend [later] reported that the acquittee had made harassing telephone calls to her. Thereafter, the acquittee's privilege level was reduced due to an increased risk of his leaving the facility without permission.

"In January, 2001, the facility reported to the board that the acquittee had displayed difficulty adhering to rules and regulations of the facility and had struggled to be open and honest with his treatment team. . . . [T]he acquittee's privilege level was placed on hold after [several incidents of inappropriate behavior of a sexual nature] in violation of facility policy.

"On December 14, 2001, the board held a hearing to review the status of the acquittee, which was continued to May 3, 2002. The testimony adduced at that hearing indicated that the acquittee had displayed significant difficulty in all treatment aspects . . . had sent a letter intended for his daughter, in violation of both the facility's mail policy and the acquittee's divorce decree, which forbade any contact between the acquittee and his daughter . . . continued to violate the facility's policies regarding sexual relationships and . . . demonstrated a consistent level of inappropriate behaviors

that now required him to be transferred to a more secure unit. [A] forensic psychiatrist for Connecticut Valley Hospital, testified at the hearing that the acquittee had displayed a level of character pathology and poor impulse control, and that he presented a danger to vulnerable patients. The acquittee thereafter was transferred to a maximum security facility on December 14, 2001.

"In the following years, the acquittee was transferred between maximum security and less restrictive confinement on a near yearly cycle. Transfers to a less restrictive confinement were based on treatment progress made during periods of maximum security confinement. Once the acquittee was returned to a less restrictive confinement, however, he resumed rule breaking behaviors, including sexual impropriety, gambling, selling cigarettes to other patients, and assaultive behavior.

"On June 22, 2006, the facility reported that the acquittee was psychiatrically stable and taking prescribed medication. That report detailed the acquittee's goals for treatment . . . [and] concluded that, although the acquittee was medically compliant and had attained a good degree of clinical stability, his own personality and characterological issues will need to be monitored to assure that his behavior is conforming to the unit rules. Six months later . . . the acquittee filed an application in a self-represented capacity for discharge from the jurisdiction of the board, but this application ultimately was withdrawn.

"Following a review hearing in August, 2007 . . . the acquittee was granted temporary leave to visit with friends and family twice per month. . . . At a status review hearing held months later, the board granted temporary leave for the acquittee to participate in day treatment services in the community four days per week.

"In March, 2011, the board held another hearing to consider further temporary leave for the acquittee. At this hearing, it was discovered that the acquittee had engaged in numerous episodes of rule breaking behavior while attending day treatment in the community, including sexual impropriety and accruing significant credit card debt of approximately $14,000. The board subsequently voted to transfer the acquittee to the Community Mental Health Center in New Haven for day treatment service that provided more structure and a higher level of supervision.

"In December, 2011, the board denied the facility's request to allow the acquittee to have overnight visits in the community based on testimony from medical experts. Significantly, in the nine months since the previous status hearing, the acquittee had increased his credit card debt to approximately $17,000. The board thus concluded that financial stress was a risk factor for psychiatric decompensation due to the acquittee's history of impulsive behavior, poor decision making, and increased risk if transitioned to a setting with decreased supervision and monitoring.

"At a subsequent hearing on May 31, 2013, the acquittee's treatment providers testified that he was an active member in his treatment groups and individual therapy. The acquittee was reported to have made good progress and had no deterioration of his mental state. Although the acquittee had continued to engage in rule violations, his providers testified that he had not engaged in violent or threatening behaviors. In light of his treatment progress, the acquittee was permitted to transition to a residential program and reside overnight in the community with continued supervision and treatment.

"On August 21, 2015, the board held another review hearing at which the board determined that, despite

attending treatment sessions and remaining clinically stable, the acquittee's temporary leave had been suspended several times due to [rule violations]. Despite these continued rule violations, the board allowed the acquittee to remain in the community on temporary leave, noting that he remained clinically stable and his community providers were committed to providing increased supervision and monitoring.

"Following a review hearing in May, 2016, the board terminated the acquittee's temporary leave privileges due to his violation of the terms of a prior decision of the board. In so doing, the board noted that the acquittee had transitioned from committing technical violations of those terms to committing more serious violations involving untruthfulness. . . .

"On February 28, 2018 . . . the acquittee filed an application with the court seeking discharge from the jurisdiction of the board. In response, the board held a hearing on April 20, 2018, to review the acquittee's status and to prepare a report to the court regarding his application for discharge. At that hearing, the board was presented with evidence of several instances of rules violations by the acquittee following the May, 2016 termination of his temporary leave. Specifically . . . the acquittee had attempted to pay another patient to assault his treating psychiatrist, had attempted to purchase cigarettes against hospital rules, and had attempted to make contact with his daughter. . . . [T]he acquittee had informed [a medical service director] that he did not want to live under any kind of rules that might typically accompany temporary leave. . . . Following the hearing, the board voted to recommend that the court deny the acquittee's application for discharge. The trial court then held a hearing on that application, which it subsequently denied on November 19, 2018.

"On October 4, 2019, the board held a hearing to review the acquittee's status and to consider the facility's application for temporary leave. Testimony established that [although] the acquittee's psychotic symptoms from the time of the offense that led to his arrest, including paranoia and auditory hallucinations, were in remission . . . the acquittee [nonetheless] had continued his rule breaking behavior and . . . it was unlikely that [he] could comply with the rules set for him and would more likely continue to challenge some rules. . . . [T]he board denied the request for temporary leave. . . .

"On November 19, 2019, the acquittee filed in the Superior Court another application for discharge from the jurisdiction of the board. The board thereafter prepared and filed a [report to the court] on December 19, 2019. In that report, the board recommended that the court deny the application . . . ." (Footnote in original; internal quotation marks omitted.) *State* v. *Ardizzone,* supra, 215 Conn. App. 856–63.

"In January, 2020, the acquittee's then current facility provided an updated report to the board on his mental condition, treatment progress, and current assessment of his risk. Although the acquittee's mental condition and treatment remained clinically stable, he had been diagnosed with stage IV prostate cancer and was undergoing treatment. In the risk assessment provided in that report, the facility stated that the acquittee remained clinically stable and free of psychotic symptoms on his medication regimen and had collaborated to make changes in his medications to address his impulsivity and smoking. The facility also noted that the acquittee recently had engaged in improper sexual activity with another patient, but thereafter complied with facility rules after that conduct was reported. The assessment indicated that the acquittee's insight, judgment, and impulse control remain limited in circumstances [in

which] his immediate desires overwhelm his ability to delay gratification, and he continues to struggle with following rules that he deems unnecessary to maintaining his psychiatric stability. The facility reported that the acquittee remained open and willing to understanding his rule breaking behaviors in individual therapy, but ultimately declined to recommend any change in the acquittee's status to the board.

"On March 3, 2020, the trial court held an evidentiary hearing on the acquittee's application for discharge from the jurisdiction of the board, at which several witnesses, including the acquittee, testified. In its subsequent memorandum of decision dated July 2, 2020, the court found that the acquittee had failed to demonstrate by a preponderance of the evidence that he is a person who should be discharged . . . and, accordingly, denied the application for discharge." (Internal quotation marks omitted.) Id., 864–65. The acquittee subsequently appealed from the court's denial of his November 19, 2019 application for discharge to this court and, on October 18, 2022, we affirmed the judgment of the trial court. Id., 865–66.

On January 26, 2021, while the acquittee's prior appeal to this court regarding his November 19, 2019 application for discharge was pending, the acquittee filed another application for discharge in the Superior Court, which is the subject of the present appeal. On November 5, 2021, the board held a hearing to review the acquittee's status pursuant to General Statutes § 17a-585.[5]

On May 10, 2021, pursuant to § 17a-593 (d),[6] the board filed a "Report to Court Re: Application for Discharge"

[5] General Statutes § 17a-585 provides: "The board shall conduct a hearing and review the status of the acquittee not less than once every two years. At such hearing the board shall make a finding and act pursuant to [General Statutes §] 17a-584."

[6] General Statutes § 17a-593 (d) provides: "The court shall forward any application for discharge received from the acquittee and any petition for

(board's report to the court), detailing the acquittee's history of evaluations, activities, and treatment. The board's report to the court set forth the following findings of fact: "Despite [the acquittee's] improvement relative to psychotic symptoms and aggression, [the acquittee] has consistently displayed a disregard for the rules and protocols in his various treatment settings. While some rule breaking behaviors have been technical in nature, such as smoking cigarettes while escorted in the community, other violations have involved planning and deception, demonstrating a blatant indifference for important safeguards. He has a history of actively misleading his treatment [team] relative to gambling activity, financial matters, and associations with women not approved by his treatment team, all known risk factors which remain largely unchanged. [The acquittee's] engagement in such behaviors exacerbates his risk to reside safely in the community.

"[The acquittee's] poor judgment and disregard for established limits that are designed to mitigate his risk have resulted in significant consequences to his goal of transitioning to the community. [The acquittee] has continued to demonstrate a blatant indifference to safeguards, rules, and stipulations designed to promote his recovery and prevent his involvement in activities that may reactivate his risk factors. [The acquittee's] judgment remains compromised as he continues to be unable to discern what is in his best interest and what behaviors may pose a risk to him. He continues to justify his refusal to follow stipulations simply because he does not believe that they should apply to him. [The acquittee's] treaters have been unable to understand the

continued commitment of the acquittee to the board. The board shall, within ninety days of its receipt of the application or petition, file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report."

origins and motivations for [the acquittee's] repeated engagement in self-sabotaging behavior, thereby limiting appropriate interventions for his antisocial traits and stating (or rendering judgment) that the same behavior would likely continue.

"Given [the acquittee's] failure to conform his behavior appropriately in supervised settings, the [b]oard concludes that [the acquittee's] behavior in a non-supervised setting would deteriorate, thereby increasing his risk for treatment noncompliance. Therefore, the [b]oard finds that [the acquittee] cannot reside safely in the community without [b]oard oversight and should remain under the supervision and jurisdiction of the [b]oard."

On November 30, 2021, the board issued a memorandum of decision in which it found the following facts: "[The acquittee] is an individual with psychiatric illness requiring care, custody, and treatment. During this review period, [the acquittee] remained hospitalized and engaged in the same behaviors of concern from previous reporting periods. While [the acquittee] remained cooperative with medication, he continued to struggle with behaviors that elevate his risk and raise concerns for his treatment team. [The acquittee] continued to exhibit impulsive and emotionally driven behaviors. Also, he continued to display inappropriate behavior toward staff members and to pursue relationships not supported by his treatment team. [The acquittee's] behavior continues to have a deceptive undertone where he will express remorse and cooperation after he is found to violate a rule; however, he can also respond with volatile behavior such as chair flipping. The board is concerned about [the acquittee] having unsupervised community time as he continued to conceal information from his treatment team, disregarded hospital and societal rules/norms and has struggled with emotional regulation." The board concluded that "[the acquittee] has a psychiatric disability to the extent that his discharge

or conditional release would constitute a danger to himself or others.”

On February 2, 2022, pursuant to General Statutes § 17a-586,[7] the acquittee’s then current facility, Whiting Forensic Hospital (hospital), provided an updated report to the board on his mental condition, treatment progress, and current assessment of his risk (hospital’s report). The hospital found that the acquittee “has chronic difficulty adhering to rules and maintaining appropriate boundaries, particularly with women. This, coupled with his limited insight, affective reactivity, and low frustration tolerance when situations do not go according to his expectations, resulted in periods of interpersonal discord and conflict with others.” Additionally, the acquittee “displayed residual paranoid thinking, but his psychotic symptoms were otherwise non-acute. His adherence to psychotropic medications was initially inconsistent, however as the reporting period progressed, he became more amenable to making adjustments to his medication regimen as recommended. [The acquittee’s] privilege level fluctuated during the reporting period in response to mood dysregulation and boundary violations. He continued to participate in weekly individual psychotherapy, and although initially his attendance in recommended groups was sporadic, his attendance improved over the course of the reporting period.”

The hospital also stated: “For the first few months of this reporting period, [the acquittee] continued to

[7] General Statutes § 17a-586 provides: “The superintendent of any hospital for psychiatric disabilities in which an acquittee has been confined or the Commissioner of Developmental Services with whom an acquittee has been placed pursuant to order of the board, or the person or agency responsible for the supervision or treatment of a conditionally released acquittee, shall submit to the board at least every six months a written report with respect to the mental condition of the acquittee. The board shall furnish copies of the report to the counsel for the acquittee and the state’s attorney.”

require ongoing reminders and education on maintaining appropriate boundaries particularly as it pertained to his interactions with two female staff members. To summarize, in August, [2021], a female staff member who had previously been transferred to another unit after repeated concerns with [the acquittee], reported that during breakfast in the [hospital's] dining hall, [the acquittee] continuously stared at her causing her to become uncomfortable. Unit staff members also observed [the acquittee] looking out the window in order to watch this staff person in the parking lot. In addition to the above, a different female employee of the hospital reached out to hospital administration; she reported that [the acquittee] called her several times at her assigned work location within the hospital and suggested that they walk outdoors together, and on a few occasions he followed her while outside on hospital grounds. Previously, when she worked on [the acquittee's] unit, he was observed to have followed her on the treatment unit as well. Hospital administration discussed their concerns with [the acquittee]. Although his insight remained limited, he agreed to stop contacting and following this staff person. The treatment team then discussed the incidents involving both women with [the acquittee] on September 17, 2021. Although [the acquittee] was receptive to discussion during his previous conversation with hospital administrators, on this occasion, he became argumentative and threw a chair in the direction of [the] [p]rincipal [p]sychiatrist, James Gusfa . . . . In response, to address safety concerns and to better monitor [the acquittee] in light of his increased reactivity, his privilege level was decreased . . . .

"To address [the acquittee's] poor boundaries, emotional outbursts, and in an attempt to help him move forward with his desired goal of community reintegration, the treatment team developed a behavioral support

plan. The behavioral support plan outlined clear expectations of [the acquittee] . . . [and] his treaters relayed that . . . [a]dherence with a behavioral support plan would demonstrate his ability to abide by rules and expectations and allow for reasonable discussions related to [t]emporary [l]eave in the future. [The acquittee] reviewed, agreed to, and signed the behavioral support plan on September 24, 2021 . . . .

"Despite [the acquittee's] efforts to improve his behavior and adhere to the behavioral support plan, interpersonal boundaries and following hospital rules and protocols remained challenging for him. A continued area of concern was money management and excessive spending. [The acquittee] continued to demonstrate poor judgment with his financial decisions and had limited insight into how his spending was a risk factor. . . . Notably, staff continued to remind [the acquittee] of the rules and expectations around money [at the hospital] and encouraged him to consider his long-term goal of transitioning to the community and the importance of both demonstrating adherence to unit rules and expectations as well as ensuring he had adequate funds to transfer to the community."

The hospital's report concluded that, "[o]verall, [the acquittee] had an uneven reporting period. He initially continued to present with difficulty maintaining prosocial interpersonal boundaries and making sound choices with regard to his finances. Through ongoing treatment targeting those areas paired with the development and implementation of a behavioral support plan, by the close of the reporting period, [the acquittee] made and maintained some clinical gains. While initially reluctant to do so, as the reporting period progressed, he collaborated with his psychiatrist to make adjustments to his medication to target residual paranoia, impulsivity, and frequent mood changes, particularly

frustration with hospital rules." On the basis of its find-
ings, the hospital recommended that the board maintain
the acquittee's treatment status.

On April 27 and 28, 2022, the court, *Dennis, J.*, con-
ducted a trial on the acquittee's application for dis-
charge. On the first day of trial, the acquittee filed a
memorandum of law in which he conceded that the
board's report to the court was admissible under our
Supreme Court's precedent; see footnote 3 of this opin-
ion; but nevertheless asserted that its admission raised
evidentiary and constitutional concerns.[8] On the same
day, the acquittee also filed a motion in limine setting
forth a constitutional challenge to § 17a-593 that he
intended to address in a posttrial memorandum. On
August 3, 2022, the parties presented their final argu-
ments to the court. On November 15, 2022, the acquittee
filed a posttrial memorandum in which he presented
his evidentiary and constitutional challenges regarding

[8] In particular, he argued that the board's report to the court should not
be admitted because it constitutes inadmissible hearsay and violates his
procedural due process rights.

At the beginning of trial, the acquittee's counsel stated: "I would like to
note for the record that, in accordance with the statutory procedure, the
board has filed a report to the court, as is required under the statute, and
that item is a matter of evidence as per [*State* v. *Harris*, 277 Conn. 378, 890
A.2d 559 (2006)] to the extent that it may be referred to in testimony of
witnesses . . . ." He thereafter requested the court to rule on his memoran-
dum of law regarding the board's report to the court, which the court did
not do at that time.

During closing arguments, on August 3, 2022, the acquittee's counsel
stated: "The law is very clear. The board's report to [the] court has the . . .
legal status, at least up until now, by [*Harris*], as an expert report. . . .
[W]e've litigated in the past whether it should be stricken for various reasons,
and we've lost those claims. However, the court, in [*Harris*], indicated that
we can use any other means at our disposal, or any other . . . standard
means to challenge the weight of the evidence, which we've done.
* * *
"[R]ather than . . . arguing that the [board's report to the court] itself
should be stricken, I think we have made arguments to show that Your
Honor should give it very little weight at this point in time because it's not
a valid forensic risk assessment and screening."

the board's report and § 17a-593, addressed this court's opinion affirming the denial of his November 19, 2019 application for discharge, and requested retroactive application of No. 22-45, §§ 4 through 6, of the 2022 Public Acts (P.A. 22-45),[9] which became effective on October 1, 2022, subsequent to his trial.

On March 1, 2023, the trial court issued a memorandum of decision regarding the acquittee's arguments set

---

[9] General Statutes § 17a-584 provides in relevant part: "At any hearing before the board considering the discharge, conditional release or confinement of the acquittee . . . the board shall make a finding as to the mental condition of the acquittee and, *considering that its primary concerns are the protection of society and the safety and well-being of the acquittee,* shall do one of the following: (1) If the board finds that the acquittee is a person who should be discharged, it shall recommend such discharge to the court . . . . (2) If the board finds that the acquittee is a person who should be conditionally released, the board shall order the acquittee conditionally released subject to such conditions as are necessary to prevent the acquittee from constituting a danger to himself or others. (3) If the board finds that the acquittee is a person who should be confined, the board shall order the person confined in a hospital for psychiatric disabilities or placed with the Commissioner of Developmental Services for custody, care and treatment." (Emphasis added.)

The legislature amended § 17a-584, effective October 1, 2022, to add to the primary concerns of the board the phrase "the safety and well-being of the acquittee." See P.A. 22-45, § 4.

General Statutes § 17a-593 (g) provides: "The court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society *and its secondary concern is the safety and well-being of the acquittee,* make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the recommendation or application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. The court shall send a copy of such finding and order to the board." (Emphasis added.)

The legislature amended subsection (g) of § 17a-593, effective October 1, 2022, to add the phrase "and its secondary concern is the safety and well-being of the acquittee." See P.A. 22-45, § 5.

Additionally, the legislature mandated that, "[o]n or before January 1, 2023, the Commissioner of Mental Health and Addiction Services shall convene a working group to evaluate the [board]," as well as guidelines and requirements of such working group. See P.A. 22-45, § 6.

forth in his memorandum of law regarding the board's report to the court, motion in limine, request to apply P.A. 22-45 retroactively, and application for discharge. The court rejected the acquittee's arguments presented in his memorandum of law and denied his motion in limine, finding that the board's report was admissible and that § 17a-593 is not void for vagueness. The court granted the acquittee's request to apply P.A. 22-45, § 5, retroactively[10] indicating that, "[a]s the amended statute [§ 17a-593] is procedural in nature, and is being applied in a civil case, there is a presumption of retroactivity." The court thereafter found that "[the acquittee] has not met his burden of proving by a preponderance of the evidence that he is a person who should be discharged. . . . [He] suffers from a psychiatric illness, which requires ongoing treatment, and [he] would be a danger to himself or others if discharged from [the board's] supervision." The court thus concluded that the acquittee should remain under the board's jurisdiction and, accordingly, denied his application for discharge. This appeal followed.

I

The acquittee first claims that the trial court improperly found that, if he were discharged from the jurisdiction of the board, he would present a danger to himself or others because (1) four providers testified that he would not constitute a danger to himself or others, (2) he had not physically attacked any person in twenty years, and (3) the state failed to prove a causal connection between his mental illness and dangerousness. After reviewing the totality of the record, we cannot conclude that the court's finding of dangerousness was clearly erroneous.

---

[10] The trial court's retroactive application of P.A. 22-45, §§ 4 through 6, is not at issue on appeal. Accordingly, all references herein to § 17a-593 are to the current revision of the statute.

As a preliminary matter, we note that "the confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness." (Internal quotation marks omitted.) *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 683–84, 578 A.2d 1025 (1990). "[A]s a matter of due process, an acquittee is entitled to release when he has recovered his sanity or is no longer dangerous." *State* v. *Metz*, 230 Conn. 400, 417–18, 645 A.2d 965 (1994).

As our Supreme Court has explained, "[a]fter an acquittee has applied for discharge from the board's jurisdiction and the board, in accordance with the requirement of § 17a-593 (d), has filed its report regarding whether the acquittee should be discharged, the trial court must hold a hearing on the application, at which the acquittee bears the burden of proving that he or she is a person who should be discharged. General Statutes § 17a-593 (f).[11] After the hearing, the court, considering that its primary concern is the protection of society [and its secondary concern is the safety and well-being of the acquittee], must make a finding as to whether the acquittee is a person who should be discharged. General Statutes § 17a-593 (g). The term [p]erson who should be discharged is defined as an

---

[11] "General Statutes § 17a-593 (f) provides [in relevant part that, at a hearing on an application for discharge], " 'the acquittee shall have the burden of proving by a preponderance of the evidence that the acquittee is a person who should be discharged.' " *State* v. *March*, 265 Conn. 697, 705 n.10, 830 A.2d 212 (2003).

acquittee who does not have psychiatric disabilities . . . to the extent that his discharge would constitute a danger to himself or others. . . . General Statutes § 17a-580 (11).'' (Footnote altered; footnote omitted; internal quotation marks omitted.) *State* v. *March*, 265 Conn. 697, 705, 830 A.2d 212 (2003). Our Supreme Court has defined ''danger to self or to others'' to mean ''the risk of imminent physical injury to others or self, including the risk of loss or destruction of the property of others.'' (Internal quotation marks omitted.) Id., 709. It has further defined ''imminent'' as ''ready to take place [or] hanging threateningly over one's head . . . .'' (Internal quotation marks omitted.) *State* v. *Harris*, 277 Conn. 378, 389, 890 A.2d 559 (2006).

The determination of dangerousness presents a question of fact for the court to resolve. See *State* v. *March*, supra, 265 Conn. 710–11. Accordingly, appellate review of a court's dangerousness determination is governed by the clearly erroneous standard. See id., 711–12. ''A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . .'' (Internal quotation marks omitted.) *Meineke Bristol, LLC* v. *Premier Auto, LLC*, 227 Conn. App. 64, 73, 319 A.3d 826 (2024). ''In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority . . . is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence . . . .'' (Internal quotation marks omitted.) *State* v. *Jacob*, 69 Conn. App. 666, 680, 798 A.2d 974 (2002).

Although the acquittee claims that the court's dangerousness determination is clearly erroneous, the record

belies that claim. In its memorandum of decision, the court indicated that it had considered, inter alia, the testimony of various medical professionals, the board's report to the court, and the hospital's report. The court specifically credited the hospital's report that the acquittee has "chronic difficulty with rule adherence and maintaining appropriate boundaries," that he engaged in stalking behavior toward two female staff members, that he threw a chair in the direction of Dr. Gusfa, and that his money management and excessive spending put him at risk for decompensation. Additionally, the court credited the board's report to the court that "[h]e has a history of actively misleading his treatment team relative to gambling activity, financial matters, and unapproved associations with women, which the [b]oard finds to be known risk factors which exacerbate his risk to reside safely in the community," that his "poor judgment in disregarding established limits designed to mitigate his risk have resulted in significant consequences to his goal of transitioning to the community," and that "[h]e continues to demonstrate a blatant indifference to safeguards, rules and stipulations designed to promote his recovery and prevent his involvement in activities that may activate his risk factors." The court, as the trier of fact, was entitled to credit that evidence. See *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007) ("[i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" (internal quotation marks omitted)). We conclude that the board's report to the court and the hospital's report provide ample support for the court to reasonably infer that the acquittee, if discharged from the jurisdiction of the board, poses a risk of imminent physical injury to himself or others.

The acquittee nevertheless points to the testimony of four providers—Marc Hillbrand and Andrew Meisler,

psychologists licensed in Connecticut, Gregory Peterson, a psychiatrist for the hospital, and Brian Conover, a clinical psychologist for the hospital—to support his argument that he is not a danger to himself or others. We are not persuaded.

As this court has observed, "psychiatric predictions of future dangerousness are tentative at best and are frequently conceded, even within the profession, to be unreliable. . . . Consequently, both the American Psychiatric Association . . . and the American Bar Association . . . have cautioned against the unfettered reliance in the criminal justice context on expert psychiatric predictions of future dangerousness as a predicate to the release from confinement of persons who have been adjudged guilty of, but not criminally responsible for, a criminal offense.

"In addition, the goals of a treating psychiatrist frequently conflict with the goals of the criminal justice system. . . . While the psychiatrist must be concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence. As a result, the determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society. . . . The awesome task of weighing these two interests and arriving at a decision concerning release rests finally with the trial court. . . .

"Although psychiatric testimony as to the [acquittee's] condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. . . . It may, in its discretion, accept all, part, or none of the experts' testimony." (Internal quotation marks omitted.) *State* v. *Corr*, 87 Conn. App. 717, 725,

867 A.2d 124, cert. denied, 273 Conn. 929, 873 A.2d 998 (2005); see also *Song* v. *Collins*, 152 Conn. App. 373, 376, 97 A.3d 1024 (2014) (finder of fact was "free to disbelieve, in whole or in part, the testimony of either or both of the expert witnesses who testified at trial" (internal quotation marks omitted)).

The court, in its memorandum of decision, discussed the testimony and reports of the acquittee's providers, particularly as they pertained to risks associated with the acquittee's stalking behavior. The court stated: "Dr. Meisler was asked what conclusions he would draw from the repeated instances of harassing or stalking behavior with various females. Dr. Meisler acknowledged that the rules and regulations put in place have been unsuccessful in stopping those behaviors. Noting that it is unlikely that [the acquittee] will engage in any sexually aggressive behaviors, he conceded that there is risk that he will continue with the behaviors including unwanted attention, phone calls, et cetera." The court also noted that, "[a]lthough it was Dr. Conover's opinion that [the acquittee] would not cross lines of appropriate behavior or become physically aggressive, absent any psychotic or psychiatric symptoms, he did concede that assaultive/aggressive acts, stealing items and stalking type behaviors could all be risk factors for future violence." Furthermore, Dr. Hillbrand acknowledged the acquittee's stalking incidents and agreed that rejection from a female romantic interest, peer member, or staff member would be a stressor that could exacerbate the acquittee's risk of decompensation.[12]

---

[12] The following exchange occurred between the state's counsel, Margaret E. Kelley, state's attorney for the judicial district of Ansonia-Milford, and Dr. Hillbrand:

"Q. And when looking to the future and looking for possibilities of stressors, you had indicated that those stressors would not be present. Wouldn't a rejection by a female or someone that [the acquittee] was interested in, couldn't that, in fact, be a very important stressor that may exacerbate the situation?

"A. Oh, yes. I think he's vulnerable like any human being to experiencing distrust of a failed relationship.

After considering Dr. Meisler's and Dr. Conover's testimonies, which indicate that the acquittee's stalking behavior is likely to continue, and Dr. Hillbrand's testimony, which indicates that rejection from a romantic interest could result in the acquittee's decompensation, the court reasonably could infer that, if the acquittee were discharged, he would present a risk of imminent physical injury to others. Such an inference is further supported by the court's explanation that, "[i]n assessing the implications of [the acquittee's] serious, and frequently obsessive 'boundary issues' with women, the court is mindful that the crime of stalking is included in the category of 'crimes against security of person' in the Penal Code." See General Statutes § 53a-181d (b) (1) (A) and (B) (defining stalking as person knowingly engaging in course of conduct, directed at specific person, that would cause reasonable person to fear for his or her physical safety or suffer emotional distress); General Statutes § 53a-181e (a) (person guilty of third degree stalking when such person recklessly causes another person to reasonably fear for his or her physical safety or suffer emotional distress).

Even if the providers' testimonies supported the acquittee's contention that he is not a danger to himself or others, it remained within the discretion of the trial court, as the trier of fact, to credit or discredit such evidence. See *State* v. *Nowell*, 262 Conn. 686, 696, 817 A.2d 76 (2003) ("the testimony was for the trial court to assess and [reviewing courts] have no appropriate

"Q. And in your review of the report to the court, as well as the periodic six month reports, you're aware, are you not, that there have been claims that [the acquittee] essentially stalked some of the female staff members? You're aware of that?

"A. Yes.

"Q. And when you talk about stressors, would not the rejection from a peer member or a female staff member, would that also not be a stressor situation?

"A. Yes, it is."

role at this level in determining which of the various witnesses to credit"); see also *State* v. *Ardizzone*, supra, 215 Conn. App. 870 ("[a]s sole arbiter of credibility, the [trial] court was free to find [some] testimony more compelling" than other testimony); *State* v. *Damone*, 148 Conn. App. 137, 174, 83 A.3d 1227 ("[a]lthough the acquittee presented the testimony of an expert who testified that he did not present a danger either to himself or to others, the court was free to reject that testimony in favor of the findings of the board"), cert. denied, 311 Conn. 936, 88 A.3d 550 (2014). Thus, we reject the acquittee's argument that his providers' testimonies render the court's dangerousness determination clearly erroneous.

The acquittee additionally argues that he has not physically attacked another person in twenty years and, therefore, the evidence shows that he is not a danger to himself or others. This argument is belied by the evidence. In 2016, the acquittee was transferred to a maximum security unit as a result of allegations that he attempted to pay another patient to assault his treating psychiatrist. The acquittee also engaged in stalking behavior toward two female staff members and, when the hospital's treatment team addressed such behavior, the acquittee threw a chair in the direction of Dr. Gusfa. Although Dr. Gusfa testified before the board that the acquittee did not attack him with the chair, he described the acquittee's behavior as explosive, impulsive, and lacking forethought. Even if the acquittee did not physically attack his providers or female staff members, the court could reasonably infer from such behavior that the acquittee continues to present a danger to others.

Lastly, the acquittee argues that the court's dangerousness determination is clearly erroneous because the state did not establish a causal connection or nexus between the acquittee's mental illness and his dangerousness. To support his argument, the acquittee cites

to medical malpractice cases in which "[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (Internal quotation marks omitted.) *Cockayne* v. *Bristol Hospital, Inc.*, 210 Conn. App. 450, 460, 270 A.3d 713, cert. denied, 343 Conn. 906, 272 A.3d 1128 (2022). Medical malpractice cases, however, are not applicable in the present matter because we have stated that "the determination of dangerousness in the context of a mental status hearing reflects a *societal rather than a medical judgment*," and the court has discretion to accept all, part, or none of an expert's testimony in making such determination. (Emphasis added; internal quotation marks omitted.) *State* v. *Corr*, supra, 87 Conn. App. 725. Moreover, the legislature has placed the burden on the acquittee to prove, by a preponderance of the evidence, that he is a person who should be discharged. General Statutes §17a-593 (f). Accordingly, the state was not required to produce expert medical testimony establishing a causal connection between the acquittee's mental illness and his dangerousness.

The acquittee also relies on Oregon case law to support his argument that the state is required to establish a causal connection between his mental illness and dangerousness. He argues that Oregon cases are instructive in the present matter because (1) Connecticut's board is modeled after Oregon's Psychiatric Review Board (Oregon board), and (2) Connecticut and Oregon are the only two states with similar statutory schemes governing acquittees. The state, on the other hand, argues that Oregon imposes a different statutory burden and, therefore, Oregon case law is not instructive in the present matter. We agree with the state.

To establish the necessity of a nexus requirement, the acquittee cites to *Drew* v. *Psychiatric Security Review Board*, 322 Or. 491, 499, 909 P.2d 1211 (1996) ("the record contains substantial evidence that could support [the Oregon board's] finding that [the acquittee] was a substantial danger to others, but [the Oregon board] did not connect its decision to that evidence"), and *Rinne* v. *Psychiatric Security Review Board*, 297 Or. App. 549, 559, 443 P.3d 731 (2019) (considering "whether substantial evidence and reason support [the Oregon board's] finding of a causal relationship between any qualifying mental disease or defect that [the acquittee] has and the substantial danger to others that he presents"). Connecticut and Oregon, however, differ on which party bears the burden when an acquittee files an application for discharge. The Connecticut legislature has placed the burden of proof on the acquittee to demonstrate, by a preponderance of the evidence, that he is a person who should be discharged. General Statutes § 17a-593 (f). On the other hand, after an acquittee has been committed for two years, the Oregon legislature shifts the burden to the *state* to prove, by a preponderance of the evidence, that the acquittee should *not* be discharged. Or. Rev. Stat. § 161.341 (4) (2023).[13] In this significant respect, the two statutory schemes governing applications for discharge are materially different. Consequently, the acquittee's contention that we should follow *Drew* v. *Psychiatric Security Review Board*, supra, 499, and *Rinne* v. *Psychiatric Security Review Board*, supra, 559, in requiring a nexus

---

[13] Section 161.341 (4) of the Oregon Revised Statutes provides in relevant part: "When application is made [for discharge or conditional release] . . . [t]he applicant must prove by a preponderance of the evidence the applicant's fitness for discharge or conditional release . . . unless more than two years has passed since the state had the burden of proof on that issue, in which case the state shall have the burden of proving by a preponderance of the evidence the applicant's lack of fitness for discharge or conditional release. . . ."

between the acquittee's mental illness and dangerousness is based on a false premise, namely, that our statutory scheme concerning discharge applications is substantially similar to Oregon's statutory scheme. For that reason, we are not persuaded that any nexus requirement set forth in *Rinne* and *Drew* is applicable to the present matter.

The state maintains that the record nonetheless supports the existence of a causal connection between the acquittee's mental illness, his rule breaking behavior, and his risk of dangerousness. In support of its argument, the state points to the board's report to the court, which states that the acquittee demonstrated "poor judgment and disregard for established limits that are designed to mitigate his risk," that he "continued to demonstrate a blatant indifference to safeguards, rules, and stipulations designed to promote his recovery and prevent his involvement in activities that may reactivate his risk factors," and that "his judgment remains compromised as he continues to be unable to discern what is in his best interest and what behaviors may pose a risk to him." We conclude that, on the basis of such evidence, the court reasonably could infer that the acquittee's mental illness causes him to engage in behaviors that exacerbate his dangerousness.

The acquittee bore the burden of demonstrating that he is a person who should be discharged. See *State* v. *March*, supra, 265 Conn. 705. The record before us contains evidence to support the court's finding that, if discharged, the acquittee would constitute a danger to himself or others. That finding, therefore, is not clearly erroneous. Because the acquittee did not satisfy his statutory burden of proof pursuant to § 17a-593, the court properly determined that the acquittee is not a person who should be discharged from the jurisdiction of the board.

II

The acquittee next claims that § 17a-593, as applied to him in the present matter, is unconstitutionally vague. He argues that (1) he had inadequate notice that his noncompliance with the hospital's rules would result in denial of his application for discharge and (2) the court arbitrarily denied his application for discharge on the basis of his noncompliance with rules that are unconnected to his mental illness and risk of dangerousness. The state, on the other hand, argues that § 17a-593, as applied to the acquittee, is not unconstitutionally vague because the acquittee's noncompliance with rules is associated with known risk factors which were communicated to the acquittee. We agree with the state.

We begin with the applicable standard of review and general governing principles. "The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review." *State* v. *Winot*, 294 Conn. 753, 758–59, 988 A.2d 188 (2010). "In challenging the constitutionality of a statute, the defendant bears a heavy burden. To prevail on his vagueness claim, [t]he defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement. . . . The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute. . . . [O]ur fundamental inquiry is whether a person of ordinary intelligence would comprehend that the defendant's acts were prohibited . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 139 Conn. App. 107, 110, 54 A.3d 638 (2012).

With these principles in mind, we turn to the statute at issue. Section 17a-593 provides that "[a]n acquittee may apply for discharge [from the jurisdiction of the board] not more than once every six months . . . ." General Statutes § 17a-593 (a). "The court shall forward any application for discharge received from the acquittee . . . to the board. The board shall . . . file a report with the court, and send a copy thereof to the state's attorney and counsel for the acquittee, setting forth its findings and conclusions as to whether the acquittee is a person who should be discharged. The board may hold a hearing or take other action appropriate to assist it in preparing its report." General Statutes § 17a-593 (d). "Within ten days of receipt . . . of the board's report filed under subsection (d) of this section, either the state's attorney or counsel for the acquittee may file notice of intent to perform a separate examination of the acquittee. An examination conducted on behalf of the acquittee may be performed by a psychiatrist or psychologist of the acquittee's own choice and shall be performed at the expense of the acquittee unless he is indigent. If the acquittee is indigent, the court shall provide him with the services of a psychiatrist or psychologist to perform the examination at the expense of the state. . . ." General Statutes § 17a-593 (e).

"After receipt of the board's report and any separate examination reports, the court shall promptly commence a hearing on the . . . application for discharge . . . . At the hearing, the acquittee shall have the burden of proving by a preponderance of the evidence that the acquittee is a person who should be discharged." General Statutes § 17a-593 (f). A " '[p]erson who should be discharged' means an acquittee who does not have psychiatric disabilities . . . to the extent that such acquittee's discharge would constitute a danger to himself or others . . . ." General Statutes § 17a-580 (11).

" 'Danger to himself or others' includes danger to the property of others . . . ." General Statutes § 17a-580 (5).

After the hearing, "[t]he court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the recommendation or application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. . . ." General Statutes § 17a-593 (g).

"We note that the statute at issue in the present case, § 17a-593, is not a criminal statute. [T]he confinement of [not guilty by reason of mental disease or defect] acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following [a not guilty by reason of mental disease or defect] acquittal, like that of civil commitment, is to treat the individual's mental illness and protect him and society from his potential dangerousness. . . . We also note that § 17a-593 was not intended to guide any individual conduct on the part of the acquittee but, rather, it serves to guide the court in making a determination about whether an acquittee is a person who should be discharged." (Citation omitted; internal quotation marks omitted.) *State* v. *Jacob*, supra, 69 Conn. App. 673.

"While a statute may be invalidated as impermissibly vague as a result of a failure to give fair warning of the conduct proscribed by law, generally, the fair-warning requirement is not applicable to commitment scheme challenges, since the person is not confined as a result

of any particular acts he or she may have performed, but is instead confined on the basis of his or her status. . . ." 53 Am. Jur. 2d 464, Mentally Impaired Persons § 4 (1996). "We, nonetheless, apply the void for vagueness doctrine to § 17a-593 in recognition of the fact that involuntary commitment imposes a significant curtailment on liberty." *State* v. *Jacob*, supra, 69 Conn. App. 673–74.

This court has previously held that § 17a-593 is not void for vagueness on its face[14] because "the ordinary meaning of the terms 'danger' and 'dangerous,' the statutory definition set out in [General Statutes] § 17a-495 (a) and (b)[15] and our Supreme Court's interpretation of 'dangerousness'[16] provide Connecticut acquittees with fair warning of what 'danger to himself or others' means for purposes of a § 17a-593 discharge application hearing, as well as the factors that a court may and should consider in making such a determination." (Footnotes added.) Id., 677. Now we turn to the acquittee's claims that he lacked adequate notice and that he was the victim of arbitrary and discriminatory enforcement.

[14] "A facial challenge, in this context, means a claim that the law is invalid in toto–and therefore incapable of any valid application. . . . A *facial* challenge, as compared to an *as applied* challenge is not dependent on the facts of a particular case." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 522 n.21, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004).

[15] Subsections (a) and (b) of General Statutes § 17a-495, which are applicable to civil commitments, define "dangerous to himself or herself or others" to mean "there is a substantial risk that physical harm will be inflicted by an individual upon his or her own person or upon another person . . . ."

Because "the legislature . . . employed nearly identical phrases in both the civil commitment and the insanity acquittee commitment statutory schemes," we previously have concluded that it "intend[ed] those phrases to have the same meaning." *State* v. *Jacob*, supra, 69 Conn. App. 675–76.

[16] As previously stated in part I of this opinion, "our Supreme Court interpreted the phrase [d]anger to self or others . . . [to mean] the risk of imminent physical injury to others or self, including the risk of loss or destruction of the property of others." (Internal quotation marks omitted.) *State* v. *Dyous*, 198 Conn. App. 253, 272, 233 A.3d 1138, cert. denied, 335 Conn. 948, 238 A.3d 17 (2020).

A

The acquittee claims that he had inadequate notice that violating the hospital's rules would result in the denial of his application for discharge pursuant to § 17a-593 because the rule violations are not listed in the relevant statutory scheme. We conclude that a reasonable person would have anticipated that the court would consider the acquittee's noncompliance with hospital rules in making a dangerousness determination and, therefore, the acquittee had adequate notice.

In the present matter, the evidence shows that the acquittee was aware of the hospital's rules and that the rules were intended to mitigate his risk of dangerousness. The hospital's report stated that the acquittee's treatment team provided "ongoing reminders and education on maintaining appropriate boundaries," and it developed a behavioral support plan "to help him move forward with his desired goal of community reintegration . . . ." The behavioral support plan clearly outlined the hospital's expectations of the acquittee and his treatment team informed him that "[a]dherence with a behavioral support plan would demonstrate his ability to abide by rules and expectations and would allow for reasonable discussions related to [t]emporary [l]eave in the future." The treatment team continued to provide "psychoeducation on appropriate boundaries and hospital rules and protocols. . . . Notably, staff continued to remind [the acquittee] of the rules and expectations around money . . . and encouraged him to consider his long-term goal of transitioning to the community and the importance of both demonstrating adherence to unit rules and expectations as well as ensuring he had adequate funds to transfer to the community."

The hospital, pursuant to § 17a-586, is required to report on the acquittee's mental health status every six months, and we have stated that the court, in making

a dangerousness determination, should "consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." (Internal quotation marks omitted.) *State* v. *Ardizzone*, supra, 215 Conn. App. 874. The hospital clearly informed the acquittee that the hospital rules were intended to mitigate his risk of decompensation and that failure to comply with hospital rules would hinder his reintegration into the community. Accordingly, the acquittee had fair warning that the hospital would report his noncompliance as it relates to his risk for decompensation and that the court would consider the hospital's report in making its dangerousness determination.

Thus, after considering the hospital's efforts to educate the acquittee on the importance of adhering to its rules, we conclude that a reasonable person would anticipate that the court would consider the acquittee's failure to abide by such rules in making a dangerousness determination. Therefore, the acquittee has not met his burden of proving beyond a reasonable doubt that he had inadequate notice that noncompliance with the hospital's rules could result in denial of his application for discharge.

B

The acquittee additionally claims that he is a victim of arbitrary and discriminatory enforcement of § 17a-593 because the trial court made its dangerousness determination on the basis of rule violations that are unconnected to his mental illness and risk of dangerousness. We are not persuaded.

Although the acquittee maintains that the court made its dangerousness determination on the basis of merely

"technical" violations of hospital rules, the court's memorandum of decision describes the acquittee's consistent pattern of noncompliant behavior, including violations of substantive rules. The board's report to the court, on which the court relied, stated: "Despite [the acquittee's] improvement relative to psychotic symptoms and aggression, [the acquittee] has consistently displayed a disregard for the rules and protocols in his various treatment settings. *While some rule breaking behaviors have been technical in nature,* such as smoking cigarettes while escorted in the community, *other violations involved planning and deception, demonstrating a blatant indifference for important safeguards.*" (Emphasis added.) Dr. Hillbrand testified that the acquittee has a long history of violating the hospital's rules, including "essential rules"—taking medication, attending therapeutic activities, maintaining general cooperation, and maintaining good relationships with peers and staff—and "minor rules"—smoking and contacting certain individuals without board approval. Indeed, the record reveals that the acquittee took his medication inconsistently, struggled to regulate his emotions, engaged in financial deception, retaliated against hospital staff members, engaged in stalking behavior toward two female staff members, and threw a chair in the direction of a provider. The court therefore reached its dangerousness determination on the basis of the acquittee's severe and repetitive noncompliant behavior.

Moreover, the evidence demonstrates that the acquittee's noncompliance with hospital rules is associated with risk factors for decompensation. The acquittee argues that "gambling, excessive spending, [and] involvement in secretive romantic relationships do not constitute a danger to [himself] or anyone else." The board, however, found that "[the acquittee's] engagement in such behaviors *exacerbates his risk to*

*reside safely in the community*." (Emphasis added.) It also found that "[the acquittee's] poor judgment and disregard for established limits that are *designed to mitigate his risk* have resulted in significant consequences to his goal of transitioning to the community. [The acquittee] has continued to demonstrate a blatant indifference to safeguards, rules, and stipulations designed to promote his recovery and prevent his involvement in activities that *may reactivate his risk factors*." (Emphasis added.) Accordingly, the hospital's rules have a direct correlation to the acquittee's risk for dangerousness.

Furthermore, the court expressly considered the acquittee's noncompliant behavior as it relates to his risk of dangerousness by stating: "Of much concern to this court is [the testimony of Paul Bryant, a psychiatrist] that, despite past efforts made by multiple treaters, [the acquittee] has been unable to appreciate the potential impact that relational or financial stressors could play on his psychotic illness, particularly in light of the fact that these factors do appear to be related to some past psychotic episodes he's had, including the one that led to the index offense." (Emphasis omitted.) The court also considered Dr. Hillbrand's testimony in which he acknowledged that rejection by romantic interests and gambling are two stressors that may exacerbate the acquittee's risk of decompensation upon release. Accordingly, the court made its dangerousness determination on the basis of rule violations that are associated with risk factors for decompensation and dangerousness and, therefore, we conclude that the acquittee has not met his burden of proving beyond a reasonable doubt that he was the victim of arbitrary and discriminatory enforcement of § 17a-593.

Because the acquittee had notice of the prohibited conduct and was not the victim of arbitrary enforcement, we conclude that the acquittee has failed to satisfy

his burden of showing that § 17a-593 is unconstitutionally vague as applied to him.

The judgment is affirmed.

In this opinion the other judges concurred.